# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| APPLIED ENERGETICS, INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2018-0489-JTL |
| GEORGE FARLEY, an individual, and ANNEMARIECO., LLC, a New Jersey limited liability company, | ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION

Date Submitted: July 23, 2020
Date Decided: August 3, 2020

Jason C. Jowers, Elizabeth A. Powers, BAYARD, P.A., Wilmington, Delaware; Patricia A. Winston, Ian D. McCauley, Kathleen A. Murphy, Kirsten A. Zeberkiewicz, MORRIS JAMES LLP, Wilmington, Delaware; David A. Robinson, Benjamin P. Pugh, ENTERPRISE COUNSEL GROUP, A LAW CORPORATION, Irvine, California; *Counsel for Plaintiff.*

Kathleen M. Miller, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington Delaware; Ryan J. Whalen, GUSRAE KAPLAN NUSBAUM PLLC, New York, New York; *Counsel for Defendants.*

**LASTER, V.C.**

Plaintiff Applied Energetics, Inc. (the "Company") has sued George Farley, its former director and principal executive officer, and AnneMarieCo, LLC, an entity owned by Farley's wife and children. The Company has asserted a variety of claims based on actions Farley took to issue himself twenty-five million shares of common stock and grant himself an annual salary of $150,000 per year. Farley has filed counterclaims against the Company for breach of contract, for unjust enrichment, and to validate his actions under Section 205 of the Delaware General Corporation Law (the "DGCL"), 8 *Del. C.* § 205. This court previously issued a preliminary injunction barring Farley and AnneMarieCo from transferring their shares pending the final disposition of this litigation. *See Applied Energetics, Inc. v. Farley* (*Injunction Decision*), 2019 WL 334426 (Del. Ch. Jan. 23, 2019, revised Jan. 24, 2019).

The Company has moved for partial summary judgment. First, the Company contends that Farley lacked authority to issue himself twenty-five million shares and grant himself an annual salary of $150,000 per year. When Farley purported to take those actions, he was the Company's sole remaining director. At the time, the board had three seats. Consistent with the default rule under Section 141(b) of the DGCL, 8 *Del. C.* § 141(b), the Company's bylaws required that a majority of the total number of directors be present at a meeting to constitute a quorum. As a matter of Delaware law, Farley could not validly take the challenged actions as the sole remaining director on a board with three seats. He could not take the challenged actions at a meeting because he could not satisfy the quorum requirement, and he could not bypass the quorum requirement by taking action by written

consent as the sole remaining director. Farley's actions as the sole remaining director were invalid, and the Company's motion for summary judgment on this issue is granted.

Second, the Company contends this court lacks the ability under Section 205 of the DGCL to validate Farley's otherwise invalid acts. Under Section 205, the court has the power to validate a defective corporate act that was within the power of the corporation to take but which failed for lack of proper authorization. In its principal argument, the Company contends that because Farley was the sole director on a board with three seats, the corporation lacked the power to take the actions in question. This contention misunderstands the distinction between the absence of corporate power and a failure of authorization. The question of corporate power refers to the ability of the corporation as an entity to engage in a particular act, regardless of what steps may be necessary to properly authorize that act. The question of authorization refers to whether the appropriate combination of intra-corporate actors—*viz.*, the officers, board of directors, or stockholders—took the proper steps to authorize the entity to exercise corporate power in compliance with the requirements of the DGCL and the corporation's constitutive documents. Here, the Company had the corporate power to issue shares and compensate its officers and directors. Farley's attempts to cause the corporation to take those actions failed because of defects in authorization. His acts therefore can be validated under Section 205. The Company's motion for summary judgment on this issue is denied.

Third, the Company asserts that Farley could not have caused the Company to agree to pay him an annual salary of $150,000, and therefore judgment should be entered in its favor on his claim for breach of contract. This aspect of the Company's motion rises and

falls based on whether the court can validate Farley's decision to grant himself a salary. The court has the power to validate that act, so the Company's motion for summary judgment on this issue is denied.

Fourth, the Company seeks summary judgment on Farley's claim for compensation under a theory of unjust enrichment. When the record is construed in Farley's favor, there is evidence which could support an award under a theory of *quantum meruit*. The Company's motion for summary judgment on this issue is denied.

## I. FACTUAL BACKGROUND

The facts are drawn from exhibits submitted in connection with the Company's motion for partial summary judgment.[1] The evidence is viewed in the light most favorable to Farley and AnneMarieCo as the non-movant defendants, who receive the benefit of all reasonable inferences.

Because of this standard, the facts as described in this decision differ substantially from the factual record as described in the *Injunction Decision*. When issuing that decision, the court could weigh evidence and choose among competing inferences when determining whether the Company had satisfied the requirements for issuing a preliminary injunction. The current procedural posture does not permit the court to weigh evidence or decide

---

[1] The evidentiary record is relatively limited. The Company submitted thirty-nine exhibits, and the defendants submitted seventy-eight. *See* Dkts. 212, 237, 244. Citations in the form "Ex. — at —" refer to these documents.

among competing inferences. As a result, the facts as set forth in this decision largely reflect the defendants' side of the story.

## A.    The Company

The Company is a Delaware corporation headquartered in Tucson, Arizona.[2] Founded in 2002 in response to the terrorist attacks on 9/11, the Company markets, develops, and manufactures products for the defense and security industry.

On March 18, 2004, the Company went public through a reverse merger with a still listed but otherwise defunct shell corporation. In connection with that transaction, the number of directors who served on the board was expanded from five to six.

Farley joined the board as the sixth director. Ex. 15 at 13 ("Farley Dep."). When he joined, Farley had approximately forty years' experience as a certified public accountant. In 1962, he started working for a predecessor to the accounting firm now known as BDO USA, LLP. He became a partner in 1972. While at BDO, he specialized in complex financial transactions and advised on more than 100 initial public offerings. He established the firm's valuation practice, served as the national director of the firm's mergers and acquisitions practice, and managed the Philadelphia office. In 1995, he left BDO to become the chief financial officer of Talk.com, Inc., where he also served as a director. Beginning in 1999, Farley operated an independent consulting practice advising public and private

---

[2] The Company was originally named Ionatron, Inc. For simplicity, this decision ignores the name change.

4

companies, and he has served as a director and audit committee member for a number of firms. *See* Ex. 21 at 31; Ex. A ¶¶ 3–5 ("Farley Decl.").

**B.      The Company's Roller-Coaster Ride**

The Company initially enjoyed success. Starting in 2003, it received federal funding that it used to develop intellectual property for laser-guided-energy applications. The Company also developed intellectual property for its direct-discharge-electrical technology, which it used to develop an anti-mine device. In May 2006, approximately two years after the reverse merger, the Company's stock price peaked at $14.24 per share, giving the Company a market capitalization of nearly one billion dollars. Soon after that, the stock price plummeted, and by December 2006, the Company's stock was trading around $4.00 per share. Over the next two years, the Company's stock price continued to decline, and by December 2008, the Company's stock price was trading around 30¢ share.

In 2009, the Company's laser failed to meet government specifications, and the government cut the Company's funding for its laser-guided-energy applications. In March 2010, the Company's common stock briefly traded over a dollar. During that year, the government cut the Company's funding for its direct-discharge-electrical technology. In December 2010, one of the Company's six directors resigned, and the board did not appoint a replacement.

In 2011, the Marine Corps cancelled its contract for the anti-mine device, leaving the Company without any sources of revenue. The Company attempted unsuccessfully to transition to the commercial market. By December 2011, the Company's stock was trading for less than 10¢ per share. In January 2012, the Company delisted from Nasdaq.

During a meeting of the board on July 9, 2012, one of the directors suggested that the Company could limit expenses by reducing the size of the board from six to three. The Company's bylaws do not fix the number of directors but rather state that the number "shall be . . . fixed by resolution of the Board." Ex. 1 art. IV § 3.

A set of unsigned minutes for the meeting on July 9, 2012, states that the board adopted the following resolutions:

> **RESOLVED**, that Mark Lister be, and hereby is appointed Chairman of the Board; and [be it] further
>
> **RESOLVED**, that the Board accept[s] the resignation [of James] Feigley and [James] Harlan effective at the close of business on July 9, 2012; and [be it] further
>
> **RESOLVED**, that the Audit, Nominating and Governance, Compensation and Strategic Planning Committee of the Board of Directors be suspended and that the activities previously conducted through such committees be conducted by the Board of Directors; and [be it] further
>
> **RESOLVED**, that George Farley be moved from Class II and [sic] Class III with his term to expire at the 2013 annual meeting of shareholders and Mr. Lister be moved from Class I to Class II, with his term expiring at the 2015 annual meeting of shareholders and, in each case, a successor being duly appointed.

Ex. 2 at 2. The board resolved that Farley and John Levy, the other remaining member of the board, would receive directors' fees of $50,000 per year. As chairman, Lister would receive a fee of $63,750.

Although it was the board's practice to review and approve minutes at the next meeting, the minutes of the meeting on July 9, 2012, remained unsigned. *See id.*; Ex. F at 19–20 ("Levy Dep."). Everyone appears to have acted as if the resolutions were effective.

6

Over the next two years, the board tried to sell the Company's patents, but third parties did not see any value in the Company's intellectual property. The board also tried to market the Company as a candidate for an entity seeking to go public through a reverse merger, but that option was unattractive because it would trigger a change-of-control payment of $25 per share to holders of the Company's Series A Redeemable Convertible Preferred Stock (the "Preferred Stock").

By the third quarter of 2014, the Company had a book value of roughly $160,000. According to the Company's unaudited financial statements for the period ended September 30, 2014, the value of the Company's assets totaled $594,708 and consisted of primarily cash and patents with nominal value. The Company's liabilities totaled $433,708.

On August 19, 2014, the board determined that the Company would stop paying directors' fees as of August 31, 2014. Ex. 8. The board suspended the Company's business activities and opted to continue as a shell company under Rule 12b-2 of the Securities Exchange Act of 1934. To qualify as a shell company under Rule 12b-2, the company must have (i) no or nominal operations, and (ii) either (1) no or nominal assets, (2) assets consisting solely of cash and cash equivalents, or (3) assets consisting of cash and cash equivalents plus nominal other assets. *See* 17 C.F.R § 240.12b-2.

Stephen Hayden was the Company's principal executive officer. Since 2012, he had also served as the Company's principal financial officer and principal accounting officer. In August 2014, the board determined that going forward, Hayden would be compensated at $250 per hour, up to a maximum of ten hours per month.

7

**C.** **Farley Becomes The Company's Sole Director And Officer.**

In February 2015, Hayden resigned. For his services during 2014, the Company paid him $107,500.

During a meeting of the board on March 2, 2015, Lister resigned. Farley and Levy appointed Farley to the positions of principal executive officer and principal financial officer. Ex. 9 at 1; Ex. J at 2. Farley's responsibilities included maintaining the Company's listing with the SEC, signing and filing its periodic reports, preserving and protecting its assets, and examining business opportunities. Ex. J; Farley Decl. ¶ 11.

Farley testified that he expected to be compensated for his services as an officer. He understood that the Company did not have the money to pay him and expected to be paid if and when the Company obtained the funds. Farley Decl. ¶ 13. He believed that the terms of his compensation were the same as Hayden's—$250 per hour for a maximum of ten hours per month. Farley Dep. 83.

Farley testified that during June and July 2015, he worked approximately ten hours per week. His tasks included maintaining the Company's financial reporting system, preparing financial reports for the SEC, meeting with potential buyers, having discussions with a potential licensee of Company patents, and having discussions with Levy about the Company's path forward. *Id.* at 38–39.

As of September 30, 2015, the Company had a cash balance of $216,947. In November 2015, to make a reverse merger more attractive for the Company's common stockholders, the Company repurchased 93,750 shares of the Preferred Stock from two holders. The liquidation preference of each preferred share was $28.48, but the Company

8

paid a total of $57,500, or 61¢ per share. After the repurchase, only 13,602 shares of preferred stock remained outstanding. The transaction implied a value for the Company's common stock of $0.0002 per share. Farley Decl. ¶ 19; *see* Ex. WWW; *see also* Ex. Q at 13; Exs. R, U.

Farley testified that during the weeks leading up to the repurchase, he spent over 20 hours per week on the Company's business. After the repurchase, he began working 40 hours a week. Among other things, he sought to re-engage with Steven McCahon, one of the Company's founders who had served as its chief technology officer. *See* Farley Dep. 197; Ex. CC at 14 ("McCahon Dep."). McCahon owned a scientific advisory firm called Applied Optical Services, Inc. ("Applied Optical"), and McCahon and Farley discussed having the Company acquire Applied Optical. Farley Decl. ¶ 16; McCahon Dep. 14, 18.

The other remaining director, Levy, was not optimistic about the Company's prospects. He believed the Company should stop spending money to maintain its patents and allow them to lapse. He also believed that the Company should stop filing reports with the SEC and give up its registration. He thought the Company should shut down entirely and close its books.

In January 2016, Farley met with Levy and the Company's outside counsel. Farley reported on a plan to work with McCahon to reactivate the Company's business. During a follow-up call, Farley said that he planned to issue five million shares each to Levy and himself as compensation for their efforts. Farley Dep. 42–44.

Levy disagreed with Farley's plan to reactivate the Company. *Id.* at 44–45. Levy also disagreed with Farley's plan to issue shares. *See* Ex. 6; Levy Dep. 41–45. Farley

disputes whether Levy disagreed with his plan to issue shares, citing evidence that he had not yet determined how many shares to issue to Levy or himself. *See* Ex. Y at 2.

On February 10, 2016, Levy resigned, leaving Farley as the sole director. There is a dispute of fact about whether Levy resigned on January 29, 2016, but it is not material. The Company's outside counsel also resigned, citing the Company's financial condition. Farley Dep. 57. The defendants cite evidence indicating that before resigning, the Company's outside counsel never raised any issue about Farley's authority to act as the sole remaining director. *See* Ex. D at 47–48 ("Mittman Dep.").

Farley tried to find a second director. He asked McCahon, who declined. He asked Hayden, who declined. So did another former director, another former Company officer, another former Company employee, and a retired admiral who had been involved with the Company during its early stages. *See* Farley Decl. ¶ 32.

## D.     The Reactivation Plan

Farley and McCahon decided that the Company would contract with Applied Optical to assemble a scientific team and develop new technologies based on the Company's patent portfolio. Farley needed a way to pay McCahon, because the Company had less than $100,000 in cash. Farley Dep. 50; *see* McCahon Dep. 17–24; *see* Ex. G. at 8–9, 124–25 ("Hayden Dep."); Ex. SSS 175 ("Schultz Dep."). Farley and McCahon agreed that the Company would issue shares of common stock to McCahon and accrue cash compensation for him at a rate of $150,000 per year, payable once the Company had sufficient funds. *See* Ex. RRR.

Farley believed that the Company also needed to pay its patent counsel to maintain its patent portfolio. Farley decided to compensate patent counsel with shares as well. Farley also decided to pay the Company's accountant with shares. Farley Dep. 71, 73; *see* Ex. DD at 134–137 ("McCommon Dep."). In addition, Farley decided to issue stock to Christopher Rahne, a long-time associate who was an expert in valuation, was "very well connected in the private equity and hedge fund arena," and had helped the Company in "negotiations with some of the financing sources." Farley Dep. 72–73.

Finally, Farley decided to issue shares to himself. He also decided to pay himself compensation, both retroactively and prospectively.

**E.     Farley Works With Stein Riso.**

During early February 2016, Farley caused the Company to retain Stein Riso Mantel McDonough, LLP as its corporate counsel. Dennis Stein had acted as Farley's personal tax attorney for a number of years and had occasionally provided tax services to the Company. Farley asked Stein to join the board, but he declined.

Stein's firm would not work for the Company without a retainer. Ex. Z at 21–23 ("Stein Dep.). Stein and Farley negotiated the terms of a retainer paid in stock over the course of several phone conversations, and Farley agreed to issue ten million shares of common stock to Stein Riso. *See id.* at 35–36, 134–37; Ex. 4. At the time, the Company's stock was trading at approximately $0.003 per share. Ostensibly for tax purposes, Stein demanded that the price be set at $0.001 per share. Farley Decl. ¶ 24; Stein Dep. 32–33, 41–42. Both Farley and Stein testified that they believed the value of the Company's stock

11

was less than $0.001 per share, citing the Company's status as a shell company and the restrictions on the ability to sell shares. *See* Farley Dep. 67–68; Stein Dep. 29–38, 80–81.[3]

In preparing the documentation for the issuance, Farley sent Stein Riso "minutes authorizing the issue of shares to [Stein Riso] and others." Ex. EE at 2. Stein Riso replied:

> 1. If the board consists of only one person, then the form of your board minutes would be OK. If there is more than one board member, then all board members should sign a written consent, unless you properly called a board meeting.
>
> 2. In terms of the content of the minutes, I have not reviewed all the boilerplate language carefully but, in my view, a board authorization concerning the issuance of shares should also address: (a) the price of the shares; (b) the number of shares; and (c) the specific recipients.

*Id.* at 1. Farley responded: "I am the only board member. I can use par value as the price per share since it approximates FMV. Will insert the names of the recipients and number of shares. I am attaching a consent for the issuance of my shares." *Id.*

Farley's work with Stein Riso resulted in two documents. The first was titled "Written Consent of Board of Directors," dated February 15, 2016, and signed by Farley as "the sole member of the Board." Ex. 4 at 1, 4. This decision refers to it as the "Board Consent."

> The Board Consent recited that the board had resolved to
>
> offer and issue to the following named individuals or entities . . . (the "Purchasers"), pursuant to the terms of subscription agreements

---

[3] The Company cites evidence which, if credited, could support a finding that the shares were not valued in good faith. *See* Exs. 29, 30; Farley Dep. 161. In the *Injunction Decision*, the court could weigh this evidence and concluded there was little basis for using a valuation of $0.001 per share. 2019 WL 334426, at *8.

12

("Agreements") to be entered into between the Corporation and the Purchasers, on a private basis (the "Offering"), of the number of Shares identified below at a price of $0.001 per Share, in exchange for services provided or to be provided to the [Company], as indicated in the respective Agreements to be entered into with the Purchaser . . . .

Steven McCahon for technical services – 20,000,000 Shares;

Stein Riso Mantel McDonough, LLP for legal services – 10,000,000 Shares;

Stephen McCommon for accounting services – 2,000,000 Shares; and

Christopher Rhane for valuation services – 1,000,000 Shares.

Ex. 4 at 1–2. The Board Consent also stated that "Farley, the Chief Executive Officer of the Corporation, hereby is granted as part of the Offering 20,000,000 Shares for past services as a Director and Chief Executive Officer of the Corporation." *Id.* at 2.

The second document resulting from Farley's work with Stein Riso was titled "Unanimous Consent of the Compensation Committee of the Board of Directors to Action Taken Without a Meeting," dated February 15, 2016. Ex. 6-1. It was signed by Farley as "Chairman" and "the sole member of the Compensation Committee." *Id.* This decision refers to it as the "Committee Consent."

The Compensation Committee was not active at that time. During the meeting of the board on July 9, 2012, the directors had resolved that the Compensation Committee "be suspended and that the activities previously conducted through such committees be conducted by the Board of Directors." Ex. 2 at 2. The record for purposes of the motion for summary judgment contains no evidence of Farley attempting to reactivate the Compensation Committee.

13

According to the Committee Consent, Farley resolved to award himself "5,000,000 shares of common stock" under a "2004 Stock Incentive Plan." Ex. 6-1. The reference to a 2004 Stock Incentive Plan was an error. The Company had created a stock incentive plan for key employees in 2007, not 2004. *See* Ex. 7 (the "2007 Plan"). The 2007 Plan authorized the Company to grant rights to a total of ten million shares, which could take the form of stock options, restricted stock, deferred stock, or stock appreciation rights. *See id.* §§ 1(t), 3, 8. A single employee could receive all ten million shares over the life of the plan, but not more than four million shares in any single calendar year. *See id.* § 3. The issuance of five million shares to Farley exceeded the annual limit.

The 2007 Plan provided that if it was administered by a committee, then the committee had to have at least two members. *See id.* § 2. In the Committee Consent, Farley purported to take action as the sole member of the Compensation Committee.

At some point after executing the Board Consent, Farley authorized the Company to issue five million shares to the Company's patent counsel. Ex. O at 30–32 ("Fettig Dep."). Farley contends that he issued these shares through a unanimous written consent executed on March 11, 2016. *See* Dkt 174 ¶ 72 (the "Counterclaims" or "Ctrcl.").[4]

---

[4] The Company cites evidence suggesting that patent counsel did not ask for compensation, only to be reimbursed for out-of-pocket expenses. *See* Fettig Dep. 34–37. Farley also entered into a consulting agreement on behalf of the Company with McCahon in which the Company agreed to issue twenty million shares and "accrue monthly payments" to McCahon "at an annual rate of $150,000." Ex. RRR § 2.

14

When Farley purported to take these actions, the Company had 91,785,520 shares of common stock issued and outstanding. The Board Consent, the Committee Consent, and the issuance to patent counsel comprised another sixty-three million shares, bringing the total number of issued and outstanding shares to 154,785,520. The Company's certificate of incorporation only authorized a total of 125 million shares.

To increase the number of authorized shares, Farley relied on an amendment to the Company's certificate of incorporation which the Company's stockholders had approved four years earlier, on April 10, 2012, but which the Company had never implemented. The Board Consent resolved

> that the authorized number of shares of Common Stock of the Corporation . . . be increased from 125,000,000 Shares to 500,000,000 Shares pursuant to the April 10, 2012 stockholder resolution that approved an amendment to the Corporation's certificate of incorporation to increase its authorized common stock from 125,000,000 to 500,000,000 Shares at such time as the Board determined that effecting such amendment would be in the best interests of the Corporation and its stockholders. The Board believes that such amendment is in the best interests of the Corporation and its stockholders and hereby directs the Chief Executive Officer to file with the Secretary of State of the State of Delaware a certificate of amendment to its certificate of incorporation increasing our authorized common stock to 500,000,000 Shares.

Ex. 4 at 1.

**F.      Farley Works With Griffitts O'Hara.**

Stein Riso recommended that Farley consult with additional counsel to ensure that the Board Consent and Committee Consent were properly drafted. In March 2016, Farley caused the Company to retain Mary O'Hara of Griffitts O'Hara LLP to opine on the validity of the Committee Consent. *See* Ex. LL at 17–18, 33–37 ("O'Hara Dep."). Her fee for this

work was $1,000. *Id.* at 29–30. O'Hara reviewed the Company's records, including the 2007 Plan, the Board Consent, and the Committee Consent. *Id.* at 20–22, 45–52, 63–65.

After O'Hara's review, Farley executed a document titled "Unanimous Consent of the Compensation Committee of the Board of Directors to Action Taken Without a Meeting," dated March 25, 2016, and signed by Farley as "the sole member of the Compensation Committee." Ex. 6-2. This decision refers to it as the "Revised Committee Consent."

The Revised Committee Consent corrected the erroneous reference to a 2004 plan by referring to the 2007 Plan. O'Hara did not catch the fact that Farley was being issued more shares than the 2007 Plan permitted. She also did not catch the requirement that if the 2007 Plan was administered by a committee, then the committee had to have at least two members.

The Revised Committee Consent purported to award two million shares to the Company's accountant and one million shares to Rahne under the terms of the 2007 Plan. As drafted, these issuances were in addition to the shares they received under the Board Consent.

Meanwhile on March 21, 2016, the Company filed a Form 8-K disclosing that the Company had amended its certificate of incorporation to increase the amount of authorized shares from 125 million to 500 million. On March 22, 2016, Stein Riso issued a legal opinion to the Company's transfer agent stating that the Company could validly issue a stock certificate to each recipient of shares. On March 28, 2016, Griffitts O'Hara issued a

16

legal opinion to the Company's transfer agent stating that the shares contemplated by the Revised Committee Consent "will be validly issued." Ex. SS.

O'Hara never had any concerns about Farley's authority to issue shares, and she never raised any issue with Farley about his authority. *See* O'Hara Dep. 41–43; Farley Decl. ¶ 15. Stein Riso never raised any issue with Farley about his ability to issue shares. *See* Stein Dep. 48–51, 59, 69–71, 88–90.

**G.     The Company Discloses The Issuances.**

On March 30, 2016, the Company filed its annual report for the year ended December 31, 2015 (the "2015 Annual Report"). The Company disclosed that it was "planning to reactivate its previous business activities."[5] The Company also disclosed that in March 2016, "Farley was granted 5,000,000 shares of common stock under the 2007 Plan," "two contractors were granted a total of 3,000,000 shares of common stock under the 2007 Plan," and "the Company sold 35,000,000 shares of its common stock to [McCahon] and 20,000,000 common shares to [Farley] for $0.001 per share." *Id.* at 7, F-19; *see id.* at 18–19. Although not material to the outcome of this decision, the disclosure appears to have mistakenly included the shares issued to Stein Riso and the Company's patent counsel in the total number of shares issued to McCahon.

---

[5] Applied Energetics, Inc., Annual Report (Form 10-K) 1 (Mar. 30, 2016), https://www.sec.gov/Archives/edgar/data/879911/000114420416091316/v435626_10k.htm.

On March 31, 2016, the Company filed a current report on Form 8-K disclosing that on March 30, 2016, 5,000,000 shares of common stock were issued to Farley under the 2007 Plan. The Form 8-K also reported that the Company had accrued $150,000 in compensation for Farley, to be paid when the Company had sufficient funds. Ex. 5. As of January 2016, the Company had begun accruing compensation for Farley at $12,500 per month. Farley Dep. 81.

It is not clear whether Farley viewed his compensation as payment for his services as an officer or as a director. The terms are more consistent with how the Company had been paying its officers. In his declaration, however, Farley averred that he contemplated being compensated as a director, explaining that "[w]hile [the Company] suspended director's [sic] fees in or about October 2014, I understood that the directors would receive compensation for the time period they served without compensation if and when [the Company] was able to do so." Farley Decl. ¶ 27. For purposes of the current motion, the distinction does not matter.

In April 2016, Farley decided to transfer some of his shares to a trust for his children. On April 8, he sent a draft trust indenture to Stein Riso. On April 26, he gifted twenty million shares to AnneMarieCo, a company owned by Farley's wife and six children. For purposes of the transfer, Farley used a valuation of $0.004 per share, reflecting the current trading price.[6]

---

[6] In the *Injunction Decision*, the court found that the Company had established a reasonable likelihood of success on the claim that the gift of stock to AnneMarieCo was a

## H. Stockholders Object To The Issuances.

Meanwhile, on April 5, 2016, Jim Hudgins called Farley and left a voicemail asking to discuss the issuances. *See* Ex. XX; Ex. WW ¶ 4 ("Hudgins Decl."). Hudgins was the CEO of Superius Securities Group, Inc., a stockholder of the Company.

On April 12, 2016, Farley called Hudgins back, and they discussed Farley's plan to reactivate the Company. Hudgins told Farley that he "was troubled" by the issuances. Hudgins Decl. ¶ 6. Four weeks later, Farley and Hudgins held a follow-up call, and Hudgins reiterated his concerns. *See* Ex. ZZ.

Hayden had also called Farley. Hayden said that he "was disappointed with the issuance because it diluted the existing shareholders." Ex. VV ¶ 4 ("Hayden Decl."). Farley

---

fraudulent transfer. 2019 WL 334426, at *10. The Company acknowledges that for purposes of its motion for summary judgment, Farley's intent is not at issue. *See* Dkt. 212 at 14–15. The defendants nevertheless attempted to respond to the court's finding by citing testimony from Stein that when Farley made the transfer, there did not appear to be any threat of litigation over the issuances. Stein Dep. 91–95; Ex. TT. Farley also submitted a declaration in which he described the transfer as part of the "regular pattern of conduct that I have engaged in for approximately the last twenty years as an estate planning practice." Farley Decl. ¶ 25. And the defendants pointed out that McCahon also gifted shares to his children. McCahon Dep. 86–90.

In the *Injunction Decision*, the court observed that when disclosing the transfer of shares to AnneMarieCo, the Company initially failed to disclose the relationship between Farley and AnneMarieCo. 2019 WL 334426, at *3. The propriety of the Company's disclosures is not at issue on this motion. The defendants nevertheless attempted to respond to the court's observation by citing O'Hara's testimony that she advised Farley that the Company filing only had to identify any beneficial owners of 10% or more of AnneMarieCo who also lived in the same household as Farley. O'Hara Dep. 134–37; *see* Ex. GGG. Farley's wife owned less than 10% of AnneMarieCo, and the children were grown and lived on their own. Farley also cited evidence supporting the inference that his son, Matt Farley, controlled AnneMarieCo, not his wife. *See* Ex. HHH.

testified that he had discussed the issuances with Hayden before he took action, and Hayden had not expressed any disapproval. Farley Dep. 100–01.

On January 13, 2017, Superius and three other stockholders sued Farley, claiming that he breached his fiduciary duties by engaging in the stock issuances. Eight months later, the action was dismissed without prejudice. *See Superius Secs. Gp., Inc. v. Farley*, 2017 WL 3919581, at *1 (Del. Ch. Sept. 6, 2017). The lawsuit did not contend that Farley lacked authority to act as the sole remaining director.

In March 2017, the Company retained Griffitts O'Hara to assist with a Form S-1 Registration Statement and the Company's annual report for the year ended December 31, 2016 (the "2016 Annual Report"). O'Hara reviewed the Company's books and records, including minutes dating back to 2012 and a questionnaire that Farley completed about the Company's directors and officers. *See* O'Hara Dep. 77–84, 94–98; Exs. CCC, DDD, EEE. O'Hara believed Farley had authority to make securities filings as the Company's sole director. O'Hara Dep. 90–92, 94–98.

On April 25, 2017, the Company exited from shell-company status. On October 31, 2017, the Company filed a Form S-1 that registered 99,053,068 shares of Company common stock for sale. At the time, the shares were trading over the counter at $0.03 per share. The selling stockholders included AnneMarieCo, McCahon, members of McCahon's family, Hayden, and Stein Riso.

## I. The Proxy Contest

Meanwhile, in September 2017, a group of Company stockholders approached Farley with a different reactivation plan. They offered the Company a financing package

that was conditioned on Farley resigning and the Company repurchasing his shares. Farley "refused to agree to any financing unless he remained on the Board and maintained his then-existing salary." Ex. 22 at 11.

The insurgent group solicited consents to remove Farley from the board and elect three new directors. On March 8, 2018, the insurgent group delivered consents from holders of 58% of the outstanding common stock. The consents removed Farley and filled the three vacancies on the board with three new directors. The insurgent group's proxy materials did not contend that Farley lacked authority to act as the sole remaining director.

Farley subsequently resigned as principal executive officer. He observes that between his appointment as principal executive officer and subsequent resignation, the Company's common stock price rose from $0.009 to $0.076 per share, an increase of 844%. Farley Decl. ¶ 33. Farley attributes the increase to his "efforts to reactivate [the Company]." *Id.* Farley maintains that he was not paid all of the compensation he was due, receiving only $69,500 out of approximately $300,000 in salary he believes he was owed from March 2016 through March 2018. Farley Decl. ¶ 34.

## J.    This Litigation

On July 3, 2018, the Company filed this action against Farley and AnneMarieCo, asserting claims for breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, conversion, and fraudulent transfer. The Company sought cancellation of the defendants' shares, an award of damages, and any other relief deemed fair or equitable. The original complaint did not assert that Farley lacked authority to act as the Company's sole remaining director.

As interim relief, the Company sought a preliminary injunction prohibiting Farley and AnneMarieCo from transferring their shares. On January 23, 2019, Justice Montgomery-Reeves, then a Vice Chancellor, granted the injunction. In the *Injunction Decision*, she held that the Company had demonstrated a reasonable probability of success on the merits of its claims that Farley (i) lacked authority to issue himself twenty-five million shares, (ii) breached his duty of loyalty by issuing himself the shares and setting his own compensation, and (iii) fraudulently transferred twenty million shares to AnneMarieCo. *See generally Injunction Decision*, 2019 WL 334426, at *5–13.

After the issuance of the *Injunction Decision*, the Company filed the currently operative complaint. It contains nine counts.

- Count I asserts that Farley breached his fiduciary duty of loyalty by engaging in self-interested transactions, failing to appoint or have the stockholders elect additional directors, executing the Board Consent, the Committee Consent, and the Revised Committee Consent, entering into a stock subscription agreement with the Company, directing the transfer agent to issue sixty-three million shares, issuing stock at a valuation of $0.001 per share, failing to obtain an independent valuation of the shares, and causing the Company to enter into a consulting agreement with Applied Optical.

- Count II asserts that Farley breached his fiduciary duty of loyalty by causing the Company to forego certain financing arrangements and enter into loans with unfavorable interest rates, prepayment penalties, and redemption terms.

- Count III asserts that Farley breached his fiduciary duty of care when taking the actions described in Count I.

- Count IV asserts that Farley breached his fiduciary duty of care when entering into the loans described in Count II.

- Count V asserts that all of the actions Farley took in his capacity as the Company's sole director from February 10, 2016, through his removal on March 9, 2018, were invalid, including Farley's issuance of twenty-five million shares to himself and his compensation of $150,000 per year.

22

- Count VI asserts that AnneMarieCo aided and abetted Farley's breach of fiduciary duty.

- Count VII asserts that Farley converted the Company's corporate records.

- Count VIII asserts that Farley fraudulently transferred twenty million shares of Company stock to AnneMarieCo.

- Count IX seeks an injunction prohibiting Farley and AnneMarieCo from transferring, selling, registering, or otherwise disposing of any shares.

The Company also sued Stein Riso in the United States District Court for the Southern District of New York, asserting claims for legal malpractice and aiding and abetting breach of fiduciary duty.

On July 19, 2019, Farley and AnneMarieCo answered the Complaint and asserted fifteen affirmative defenses. Farley asserted a counterclaim with four counts.

- Count I asserts that Farley caused the Company to agree to pay him an annual salary of $150,000, that he is due at least $230,000, and that he is entitled to recover for breach of contract.

- Count II asserts that Farley conferred benefits on the Company through his actions as a director such that the Company would be unjustly enriched if Farley was not awarded some form of damages.

- Count III asserts that Farley performed services for the Company with the reasonable expectation of compensation such that the Company would be unjustly enriched if Farley did not receive compensation for his services.

- Count IV asserts that the court should exercise its authority under Section 205 of the DGCL to validate the actions that Farley took between February 10, 2016, and March 9, 2018, including Farley's issuance of twenty-five million shares to himself and his compensation of $150,000 per year.

AnneMarieCo joined in Count IV of the Counterclaims. During oral argument on the motion for summary judgment, Farley's counsel agreed that there was no appreciable difference between Counts II and III of the Counterclaims.

23

While the litigation was pending, the Company entered into a new consulting agreement with McCahon. The Company agreed to pay him a consulting fee of $180,000 for the first year and $250,000 during each of the second and third years. In a section titled "Further Considerations," the parties reached the following agreements regarding McCahon's shares:

> a. . . . In exchange for the consideration set forth in Section 4.b., below, the Company agrees that [McCahon] shall be entitled to retain the 20,000,000 shares, and the Company agrees that it will not challenge the initial issuance of such 20,000,000 shares to [McCahon] or any provisions of the Prior Consulting Agreement.
>
> b. The parties shall enter into a separate agreement pursuant to which the Company shall purchase 5,000,000 shares of the 20 million shares referenced in 4.a from [McCahon] at a price of $0.06 per share in alignment with recent equity offerings conducted by the Company. . . .
>
> c. The Company agrees to use its best efforts to have the restrictive legend removed from the remaining 15,000,000 shares, so that they may be transferred or sold without restriction . . . .
>
> d. The parties agree that 5,000,000 shares of the 15,000,000 shares referred to in Section 4.c. will be subject to a lock-up on their sale and should be released from the lock-up at a rate of $5,000,000 / 36 = 138,889$ shares per month for the 36-month duration of this Agreement. . . .

Ex. 25 § 4.a, b, c, & d.

On December 6, 2019, Justice Montgomery-Reeves was elevated to the Delaware Supreme Court, and the action was reassigned.

## II. LEGAL ANALYSIS

The Company has moved for partial summary judgment on Count V of the Complaint and on Counts I–IV of the Counterclaims. Summary judgment may be granted only when "there is no genuine issue as to any material fact" and the "moving party is

entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). "The role of a trial court . . . is to identify disputed factual issues whose resolution is necessary to decide the case, but not to decide such issues. In discharging this function, the court must view the evidence in the light most favorable to the non-moving party." *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99 (Del. 1992) (citation omitted). Summary judgment "must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom." *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970).

## A. Count V Of The Complaint: The Validity Of The Actions Farley Took As The Sole Remaining Director

In Count V of the Complaint, the Company asserts that the actions Farley took as the sole remaining director after Levy resigned on February 10, 2016, until Farley's removal on March 9, 2018, were not properly authorized and therefore invalid. Although the Company challenges all of Farley's actions, it targets his issuance to himself of twenty-five million shares and his approval of his own compensation of $150,000 per year. The Company is entitled to summary judgment on this count.

### 1. Statutory Invalidity

The validity of the actions Farley took after February 10, 2016, until his removal on March 9, 2018, turns on his ability to act as the sole remaining director. Although Farley was the sole remaining director, the board had three seats, and the Company's bylaws required the presence of a majority of the total number of directors to constitute a quorum for action at a meeting. As the sole remaining director, Farley could not meet the quorum

25

requirement and therefore could not take action at a meeting. Farley also could not act by unanimous written consent without a meeting, because Delaware law requires that the number of directors acting unanimously by written consent be sufficient to constitute a quorum if the action was taken at a meeting. The actions Farley took as the sole remaining director, including his approval of the Board Consent and the Revised Committee Consent, are therefore invalid as a matter of law.

Section 141 of the DGCL provides that "[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors . . . ." 8 *Del. C.* § 141(a). A board of directors can take action in two ways. One way is through a resolution adopted at a meeting. *See id.* § 141(b). Another is through unanimous action by written consent without a meeting. *See id.* § 141(f). The same rules apply to committees. *See id.* § 141(c)(4), (f).

To take action at a meeting, there must be a sufficient number of directors present to constitute a quorum. Section 141(b) states that "[t]he vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the board of directors unless the certificate of incorporation or bylaws shall require a vote of a greater number." *Id.* § 141(b). The same provision states,

> A majority of the total number of directors shall constitute a quorum for the transaction of business unless the certificate of incorporation or the bylaws require a greater number. Unless the certificate of incorporation provides otherwise, the bylaws may provide that a number less than a majority shall constitute a quorum which in no case shall be less than 1/3 of the total number of directors.

26

*Id.* This oddly drafted couplet establishes a default rule under which a majority of the total number of directors is required for a quorum, but where the number of directors required for a quorum can be set higher or lower, although not lower than one-third of the total number of directors. The "universal construction" of the phrase "total number of directors" is "that it refers to directorships, not directors actually in office." *Crown EMAK P'rs LLC v. Kurz*, 992 A.2d 377, 400 (Del. 2010) (internal quotation marks omitted).

Under this statutory scheme, if the number of directors in office is less than the number of directors necessary for a quorum, then the directors in office cannot take action at a meeting. To address the resulting risk of deadlock, Section 223(a)(1) of the DGCL authorizes "a majority of the directors then in office, although less than a quorum" or "a sole remaining director" to fill vacancies.[7] It is thus a matter of blackletter law that "vacancies in the board reducing the number to less than a quorum of the number fixed by statute or otherwise preclude action by the remaining directors other than to fill the

---

[7] 8 *Del. C.* § 223(a)(1) ("Vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director."). There are additional rules for committees. The board may appoint additional members to the committee, or the board may designate alternative members who may replace any absent or disqualified member. *See id.* § 141(c)(1) & (2). In addition, "[t]he bylaws may provide that in the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not the member or members present constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in the place of any such absent or disqualified member." *See id.* §§ 141(c)(1) & (2). None of the special rules for committees applies in this case.

vacancies." 2 *Fletcher Cyclopedia of the Law of Corporations* § 419, Westlaw (database updated Sept. 2019).

A board or committee may also take action by unanimous written consent without a meeting. Section 141(f) states that "any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting if all members of the board or committee, as the case may be, consent thereto in writing, or by electronic transmission." 8 *Del. C.* § 141(f).

Section 141(f) does not state explicitly that the number of directors executing the written consent must be sufficient to satisfy a quorum, but that result is implicit in the statutory reference to "any action required or permitted to be taken at any meeting." For action to be "taken at any meeting," a quorum must be present, and a sufficient number of directors must vote in favor of the action to be taken to satisfy the applicable voting threshold. By statute, that voting threshold is a majority of a quorum, "unless the certificate of incorporation or the bylaws require a greater number." *Id.* § 141(b). When action is taken without a meeting, Section 141(f) raises the voting threshold from a majority of a quorum (or greater number as required by the charter or bylaws) to unanimity. Section 141(f) does not dispense with the basic requirement that the number of directors acting unanimously must be sufficient to constitute a quorum.

This interpretation finds support in other sections of the DGCL which authorize a number of directors that is less than a quorum to act in special situations. The most obvious is Section 223(a)(1). As noted, it authorizes "a majority of the directors then in office, although less than a quorum" or "a sole remaining director" to fill vacancies or newly

28

created directorships *See id.* § 223(a)(1). Another example is the recently amended Section 110, which provides that during an emergency, the board of directors may adopt emergency bylaws, operative during the emergency, "irrespective of whether a quorum of the board of directors or a standing committee thereof can readily be convened for action." H.B. 341, 150th Gen. Assem. § 4 (2020); *see* 8 *Del. C.* § 110(a). The provision further states that the emergency bylaws may provide that the "director or directors in attendance at the meeting, or any greater number fixed by the emergency bylaws, shall constitute a quorum." 8 *Del. C.* § 110(a). In the 2020 amendments, the General Assembly adopted Section 110(i), which states that during any emergency condition, "the board of directors (or, if a quorum cannot be readily convened for a meeting, a majority of the directors present) may" take action that it determines to be practical and necessary to address the circumstances of such emergency with respect to either a meeting of stockholders or a dividend that has been declared as to which the record date has not yet occurred.[8]

Except for specific provisions that authorize action by directors comprising less than a quorum in particular situations, the DGCL operates on the principle that the number of directors taking action must always satisfy the requirement for a quorum. Once the quorum requirement is met, a sufficient number of directors must approve the action to satisfy the

---

[8] H.B. 341, 150th Gen. Assem. § 4 (2020). As noted, Sections 141(c)(1) and (c)(2) authorize a corporation's bylaws to provide that "the member or members present at any meeting and not disqualified from voting, whether or not the member or members present constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in the place of any such absent or disqualified member." 8 *Del. C.* § 141(c)(1) & (2).

applicable voting threshold. For action at a meeting, the voting threshold is a majority of the quorum (or a greater number if specified in the charter or bylaws). For action without a meeting, Section 141(f) sets the requisite voting threshold at unanimity.

The defendants argue that as long as the remaining directors then in office acted unanimously, even if less than a quorum, then Section 141(f) is satisfied. That interpretation is contrary to the structure of the statute, and it would permit directors to act by unanimous written consent even if they could not satisfy a quorum requirement and therefore take action at a meeting. *Id.* § 141(f). It would also render superfluous provisions like Section 223(a)(1) and 110(a). There would be no need to authorize the remaining directors in those settings to take action, even though their number was less than a quorum, because the remaining directors in office could simply act by written consent.

Section 141(f) is not a vehicle for directors to avoid the requirements of a meeting. It is a vehicle for directors to use when they could satisfy the requirements for action at a meeting but the consensus is unanimous and thus a meeting is unnecessary. "The policy underlying board action by written consent is that 'meetings should be required except where the decision is so clear that the vote is unanimous and in writing.'"[9] Meetings are

---

[9] *Solstice Cap. II, Ltd. P'ship v. Ritz*, 2004 WL 765939, at *1 (Del. Ch. Apr. 6, 2004) (quoting what is now 1 R. Franklin Balotti & Jesse A. Finkelstein, *Balotti and Finkelstein's Delaware Law of Corporations and Business Organizations* § 4.8[F] (3d ed. Supp. 2020-2), Westlaw (database updated 2020)); *cf.* Ernest L. Folk, III, *Review of the Delaware General Corporation Law for the Delaware Corporation Law Revision Committee 1965–67*, at 61 n.2 (1964), https://delawarelaw.widener.edu/files/resources/folkreport.pdf ("It is occasionally suggested that non-unanimous written consents should be as effective as unanimous consents. On this theory, a written consent by a majority of directors would be

intended to provide directors with "forums in which ideas are exchanged and (hopefully) a consensus reached." Folk, *supra*, at 61 n.2. To further this policy, each director is entitled to know when a board meeting is taking place (either as a regular meeting or as a properly noticed special meeting), and action taken at a secret or improperly noticed meeting can be invalidated in equity. *See generally Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *4–17 (Del. Ch. Nov. 7, 2013).

> The reason and principle underlying these decisions is this: Each member of a corporate body has the right to consultation with the others and has the right to be heard upon all questions considered, and it is presumed that if the absent members had been present they might have dissented and their arguments might have convinced the majority of the unwisdom of their proposed action, and thus have produced a different result. If, however, they had notice and failed to attend they waived their rights; likewise if they signed a waiver of notice prior to the meeting . . . .[10]

The defendants' interpretation would permit the remaining directors in office, although less than a quorum, to avoid reconstituting the board and bypass meetings by taking action by

---

as effective as majority action taken at a duly called meeting. This could, however, raise serious questions as to whether the non-consenting directors had received notice, whereas unanimous written consent ipso facto proves notice actually received. Besides raising more questions that it would solve permitting non-unanimous written consents would make serious inroads upon the concept of meetings as forums in which ideas are exchanged a[n]d (hopefully) a consensus reached.").

[10] *Lippman v. Kehoe Stenograph Co.*, 95 A. 895, 11 Del. Ch. 80, 89 (Del. Ch. 1915) (quoting *Holcombe v. Trenton White City Co.*, 86 A. 618, 624 (N.J. Ch. 1912), *aff'd*, 91 A. 1069 (N.J. 1913)); *see also In re Acadia Dairies, Inc.*, 135 A. 846, 847 (Del. Ch. 1927) (noting that a director cannot act *qua* director by proxy); *Lippman*, 11 Del. Ch. at 85 (explaining that the reason a director cannot act by proxy is that "his associates are entitled to his judgment, experience and business ability, just as his associates cannot deprive him of his rights and powers as director").

written consent. That approach runs counter to Delaware's policy in favor of collective deliberation and decision-making.

In this case, Farley purported to act as the sole remaining director. During the time he acted, the board had three seats.[11] The Company's certificate of incorporation and bylaws did not lower the default rule that a majority of the total number of directors was necessary for a quorum. To the contrary, the Company's bylaws provided that "[a]t all meetings of the Board of Directors, the presence in person of a majority of the total number of directors shall be necessary and sufficient to constitute a quorum for the transaction of business . . . ." Ex. 1 art. VII § 3. As a result, a quorum required a majority of the total number of directorships. For a board with three seats, a quorum required two directors, and Farley could not meet it.

Farley therefore could not take action at a meeting because he could not meet the requirements for a quorum. For the same reason, Farley could not take action by written consent without a meeting.

The Board Consent was not validly approved by the unanimous consent of all of the directors then in office at a time when the number of directors in office was sufficient to

---

[11] There is arguably a dispute of fact as to whether the board had three or six seats, because the minutes memorializing the resolution on July 9, 2012, to reduce the number of directorships from six to three remain unsigned. The evidence that the board took that action is sufficiently one-sided that the court could likely grant summary judgment on this issue in any event, but the dispute is immaterial. In either case, Farley could not satisfy the quorum requirement as the sole remaining director.

constitute a quorum for action at a meeting. The actions taken in the Board Consent were therefore invalid, including Farley's issuance of twenty million shares to himself.

For the same reason, Farley could not validly take action to approve his own salary. Directors have the authority to set their own compensation. *See* 8 *Del. C.* § 141(h). And a corporation has the power to pay suitable compensation to its officers and agents. *See id.* § 122(5). To take these actions, however, the board must have sufficient members to constitute a quorum. As the sole remaining director, Farley could not satisfy the quorum requirement.

The Revised Committee Consent was also invalid. There is no evidence in the record that the Compensation Committee was ever reconstituted after the board suspended its operations on July 9, 2012. As the sole remaining director, Farley could not satisfy the quorum requirement, and he therefore could not reactivate or populate the committee.[12]

---

[12] *See id.* § 141(b), (c)((1) & (2), & (f). Technically, the analysis at the committee level is more nuanced because the voting standard that governs when a board takes action regarding a committee depends on whether the corporation was formed before or after July 1, 1996. *See id.* § 141(c)(1). The default rule for corporations formed before July 1, 1996, is that the vote of a majority of the whole board is required to "designate 1 or more committees." *Id.* The default rule for corporations formed after July 1, 1996, is that only a majority of a quorum is necessary to designate a committee. *Id.* § 141(c)(2). The Company was formed after July 1, 1996, but it went public through a reverse merger with and into an existing shell corporation that was formed before July 1, 1996. *See* Ionatron, Inc., Current Report (Form 8-K) (Mar. 18 2004), https://www.sec.gov/Archives/edgar/data/879911/000114420404003455/v02210_8-k.txt (describing merger); *see also* Ex. FF (attaching the shell corporation's original certificate of incorporation filed on January 6, 1992); US Home & Garden Inc, Notification of Late Filing (Form 12b-25) (Sept. 27, 1996), https://www.sec.gov/Archives/edgar/data/879911/0000891554-96-000621.txt (shell corporation's filing with the SEC that reports of "its results of operations for the fiscal year

Farley was a member of the Compensation Committee before its operations were suspended, but he was one of two members of the Compensation Committee; the other was James Harlan.[13] To conduct business under a standard that requires a majority of the members for a quorum, a committee with two members needs the presence of both members. As the sole remaining member of the Compensation Committee, Farley could not satisfy the quorum requirement.

Farley also did not have authority under the 2007 Plan to award shares as the sole member of a committee. The 2007 Plan provided that if a committee administered the plan, then it had to have at least two members. *See* Ex. 7 § 2.

Farley's issuance to himself of twenty-five million shares was therefore invalid. So too was his determination to pay himself $150,000 per year. Summary judgment on these issues is granted in favor of the Company.

### 2. An Implied Amendment To The Bylaws

To avoid the implications of the quorum requirement, the defendants argue that the bylaws were amended implicitly, either to reduce the size of the board to one director or to

---

ended June 30, 1996" would be delayed). It therefore appears that the affirmative vote of directors sufficient to constitute a majority of the whole board was required to re-activate the Compensation Committee, rather than just a majority of a quorum. *See* Ex. FF (attaching the Company's certificate of incorporation and amendments, none of which alter the requirement under 8 *Del. C.* § 141(c)(1)). The outcome is the same: Farley lacked authority to act as the sole remaining director.

[13] *See* Applied Energetics, Inc., Annual Report (Form 10-K) 24 (Mar. 29, 2012), https://www.sec.gov/Archives/edgar/data/879911/000114420412018030/v307134_10k.htm.

keep its size at three and reduce the quorum requirement to one-third so that Farley could take action by written consent. The defendants contend that "there is a triable issue of fact as to whether [the Company's] by-laws were implicitly amended to reduce the number of directors seats to one; and/or to permit [Farley], as sole director, to act on behalf of the board." Dkt. 237 at 53. The defendants' arguments only address board-level action. They do not make any arguments regarding implied amendments for committee-level action. In any event, their evidence is insufficient to create a material dispute of fact. Judgment on this issue is granted in the Company's favor.

"Ordinarily, a corporate by-law may be amended by implication and without any formal action being taken by clear proof of a definite and uniform custom or usage, not in accord with the by-laws regularly adopted, and by acquiescence therein . . . ." *In re Ivey & Ellington, Inc.*, 42 A.2d 508, 509 (Del. Ch. 1945); *accord In re Osteopathic Hosp. Ass'n of Del.*, 195 A.2d 759, 762 (Del. 1963); *see also Star Loan Ass'n v. Moore*, 55 A. 946, 946 (Del. Super. 1903). "[T]he course of conduct relied on to effect the change must have continued for such a period of time as will justify the inference that the stockholders had knowledge thereof and impliedly consented thereto." *Ivey & Ellington*, 42 A.2d at 509; *accord Osteopathic Hops.*, 195 A.2d at 762.

By definition, bylaws can only be amended by implication through a course of action by intra-corporate actors who otherwise would have the authority to amend the bylaws. Under the Company's certificate of incorporation, both the stockholders and the board of directors had the authority to adopt, repeal, or amend bylaws. *See 8 Del. C. §* 109(a); Ex. FF attach. 1 art. VIII. Once Farley became the sole remaining director, he

35

lacked the authority to amend the bylaws, because he could not satisfy the quorum requirement. His actions are therefore insufficient to support an amendment by implication.

Even if Farley had authority to amend the bylaws, his actions were insufficient to create a material dispute of fact as to whether an amendment by implication took place. Farley became the sole remaining director on February 10, 2016. He executed the Board Consent five days later on February 15, 2016. He purported to execute the Revised Committee Consent just thirty-nine days later on March 25, 2016. Neither period of time was sufficient to create a dispute of material fact about a custom and practice or course of conduct that could support an amendment by implication. And during these brief interim periods, Farley did not engage in any actions that would have supported a constructive amendment of the bylaws. The actions that the defendants cite occurred later, over the subsequent two years. That course of conduct cannot retroactively amend the bylaws by implication so that Farley could have taken the actions he immediately took after becoming the sole remaining director.

Because Farley lacked authority as the sole remaining director to amend the bylaws, the stockholders were the only intra-corporate actor with the power to amend the bylaws between February 10, 2016, until March 9, 2018. The precedents on implicit bylaw amendments consistently apply the doctrine to favor stockholder rights, not to favor incumbent director rights. *See, e.g.*, *Dousman v. Kobus*, 2002 WL 1335621, at *5 (Del. Ch. June 6, 2002); *Ivey & Ellington*, 42 A.2d at 509; *Belle Isle Corp. v. MacBean*, 49 A.2d 5, 8 (Del. Ch. 1946) (Seitz, V.C.).

*Dousman* illustrates this principle. There, the corporation's bylaws required a two-thirds majority of a quorum for stockholders to take action at a meeting. *Dousman*, 2002 WL 1335621, at *2. For three years, however, the corporation disclosed that stockholders could take action with a simple majority of a quorum. *Id.* Stockholders assembled sufficient proxies to remove the incumbent directors under a simple majority standard, but not under the two-thirds standard. *Id.* at *3. The court found it reasonably conceivable that the board's conduct had amended the bylaws to eliminate the supermajority requirement and permit the stockholders to act by a simple majority of a quorum. *Id.* at *4–5.

The court again favored stockholders in *Ivey & Ellington*. There, the corporation's bylaws provided for a board of three directors, but the controlling stockholders elected two additional directors and seated a board of five. *Ivey & Ellington*, 42 A.2d at 508. Over the next two years, the board met only four times. The controlling stockholders then notified the directors that the bylaws only contemplated three seats. *Id.* at 509. The directors declined to step aside, and in the ensuing litigation, argued that the bylaws had been impliedly amended. *Id.* The court rejected this argument, explaining that "[w]here, as here, but one inconsistent act is relied on and it does not appear that the stockholders were actually aware of the by-law provision, an intent to amend is not demonstrated." *Id.* at 510.

Finally, in *Belle Isle*, then-Vice Chancellor Seitz considered whether a corporation had validly issued 75,000 shares of common stock at a board meeting held in 1944. 49 A.2d at 7. In 1939, the stockholders had increased the number of directors from seven to ten. *Id.* No additional directors were ever appointed, and only four of the seven directors in office attended the meeting in 1944. *Id.* at 8. The court held that the issuance was invalid

37

for lack of a quorum and rejected the argument that the absence of any board or stockholder action in the interim resulted in an implied amendment. *Id.* In language applicable to the current case, then-Vice Chancellor Seitz could not "conceive how total stockholder and director inaction can form the basis for a custom inconsistent with a written by-law provision." *Id.* The court also questioned whether the existence of vacancies could ever be considered inconsistent with the bylaws, since having less than the maximum number of directors did not give rise to any conflict. *Id.* at 9.

Under these precedents, the evidence is insufficient to create a dispute of material fact regarding whether the stockholders implicitly amended the bylaws. As a threshold matter, the defendants cannot even say how the bylaws were amended. They suggest that the bylaws were implicitly amended to reduce the size of the board to one director or, alternatively, to keep the size of the board at three and reduce the quorum requirement to one-third. Both implicit amendments address board-level action. Neither addresses committee-level action. To encompass Farley's efforts to act at the committee level, the defendants would have to come up with still more possible amendments. As this court explained in *Ivey & Ellington*, an amendment by implication requires "clear proof of a definite and uniform custom or usage." 42 A.2d at 509. The defendants have proffered alternative customs and usages, not a definite and uniform custom and usage.

The defendants also have not pointed to any action by the stockholders that would suggest acquiescence. To support some form of amendment by conduct, the defendants cite the following public filings:

- A current report on Form 8-K, filed on February 10, 2016, which disclosed that Levy resigned.

- A current report on Form 8-K, filed on March 21, 2016, which disclosed that the Company amended its certificate of incorporation to increase the amount of authorized shares from 125 million to 500 million.

- The 2015 Annual Report, filed on March 30, 2016, which disclosed that Farley was the Company's sole director and officer and that the Company issued Farley twenty million shares of common stock.

- A current report on Form 8-K, filed on March 31, 2016, which disclosed that the Company issued five million shares to Farley under the 2007 Plan and that his salary was $150,000 per year payable when the Company had sufficient funds.

- The 2016 Annual Report, filed on March 31, 2017, which identified Farley as the Company's sole director and officer.

- The five Form S-1's filed for comment with the SEC between April 21, 2017, and October 31, 2017, which identified Farley as the Company's sole director and officer.

There are several problems with the defendants' reliance on these filings.

First, none of the filings suggests anything about an amendment to the bylaws to either reduce the size of the board or lower the quorum requirement. None of the filings addresses action at the committee level. The filings thus did not put the stockholders on notice that any course of conduct contrary to the existing bylaws was underway.

Second, each of the filings was made by Farley. None of the filings reflects action by the stockholders. During the period of time when Farley purported to act as the sole remaining director, there were no meetings of stockholders and no attempts by stockholders to take action by written consent. At most, there was stockholder inaction, which is the opposite of a definite custom and usage. The only instance of affirmative stockholder action was inconsistent with an implicit amendment. When a stockholder majority acted to

39

remove Farley by written consent, they proceeded in accordance with the existing charter and bylaws, and they filled the resulting vacancies with three nominees.

Third, the defendants' reliance on these public filings runs contrary to their representations to this court. After the hearing on the Company's application for a preliminary injunction, the court asked the parties to supplement the record with an answer to the question: "What was the total number of directors fixed by, or in the manner provided in, the bylaws of [the Company] operative on February 15, 2016?" Dkt. 112 at 2. The defendants responded as follows:

> The bylaws in effect February 15, 2016, provide . . . in relevant part: "The number of directors comprising the Board of Directors shall be such number as may be from time to time fixed by resolution of the Board of Directors."

> At the July 9, 2012 Board meeting, the number of directors was set at three. As of March 2015, the Board was comprised of [sic] Mark Lister, Jonathan Levy, and George Farley. On February 23, 2015, Mark Lister resigned. On February 10, 2016, Jonathan Levy resigned. After these resignations, Farley sought out others to fill the vacancies, but no one was willing to serve as a director. Even McCahon refused to serve.

Dkt. 115 at 1–2 (citations omitted). Farley thus recognized that the bylaws set the size of the board at three, that two of the three directors resigned, and that he was the sole remaining director on a board of three. He also noted that he sought out others to fill the vacancies. He did not argue that the bylaws had been amended in any way.

The most that the defendants can point to in an effort to create a material dispute of fact is that neither the complaint in the *Superius* action, the stockholders in the proxy contest, nor the initial complaint in this action asserted that Farley lacked authority to act as a sole remaining director. There is a fundamental difference between stockholders

knowingly consenting over an extended period of time to action contrary to the bylaws, and stockholders not taking any action. The evidence in this case at most suggests the latter. There is no evidence of the former.

The evidence is not sufficient to create a disputed issue of material fact as to whether the bylaws were amended by implication. Summary judgment on this issue is granted in favor of the Company.

### 3.    Ratification

The. defendants separately argue that even if Farley did not validly authorize the issuances of stock to himself, then the Company's motion for summary judgment on Count V should be denied because the Company ratified all of the issuances that Farley approved by not seeking to invalidate the shares of common stock received by McCahon, Stein Riso, the Company's patent counsel, or the Company's accountant. Citing the Company's settlement with McCahon, the defendants contend that the Company must have ratified the issuances because it would otherwise have had to either "(1) 'properly' issue McCahon 20 million shares in 2019 and then effect the agreement . . . , or (2) ratify the 2016 issuance to McCahon [under Section 204 of the DGCL]." Dkt. 237 at 58–59 (footnote omitted).

The Company quite obviously has claims against all of the recipients of the shares that Farley issued. A cause of action belonging to a corporation is a corporate asset that a board of directors can determine whether or not to assert. *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (subsequent history omitted); *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981). When deciding whether or not to assert a corporate claim, a board of

directors can take into account a range of factors.[14] The fact that a board of directors chooses not to assert a particular claim does not mean that the corporation has ratified the transaction giving rise to the claim.

The Company's decision to reach a settlement with McCahon and its decision not to pursue claims against other recipients of shares does not mean that the Company has ratified the issuances. It means that the Company's duly authorized representatives have made decisions about whether to pursue those claims. *Cf. TR Inv'rs, LLC v. Genger*, 2010 WL 2901704, at *17 (Del. Ch. July 23, 2010) ("Of course, the Trump Group received a benefit when it purchased the Sagi Shares from the Sagi Trust and TPR, but that benefit is not an indication of the Trump Group's ratification of the 2004 Transfers. Rather it is consideration of a settlement that resolved the very problem Genger had created. In other words, Genger's argument confuses the benefits that come from compromising claims away in return for a settlement with taking a benefit from a voidable transaction that indicates ratification."), *aff'd*, 26 A.3d 180 (Del. 2011).

---

[14] *See La. Mun. Police Empls.' Ret. Sys. v. Pyott*, 46 A.3d 313, 339 (Del. Ch. 2012) ("[T]he board can take into consideration and balance the interests of multiple constituencies when determining what outcome best serves the interests of stockholders."), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013); *see also* 1 Balotti & Finkelstein, *supra*, § 13.15 (listing factors that special litigation committee should consider whether to assert a corporate claim or take other action, including the "magnitude and merit of the claims," the "size and likelihood of a recovery of damages or other relief," the "possible detriment to the company from the assertion of any claims, as well as the indirect costs, such as the effect upon other potential litigation to which the company is a party, and relationships with customers or suppliers," and the "remedial steps already taken and that, in the future, could be taken by the corporation to prevent a reoccurrence of the challenged actions").

The evidence is not sufficient to create a disputed issue of material fact as to whether the issuances were ratified. Summary judgment on this issue is granted in favor of the Company.

### 4. The Status Of The Shares Owned By AnneMarieCo

Farley's transfer of twenty million shares to AmneMarieCo does not change the analysis for purposes of those shares. Under Delaware law, invalid shares in the hands of innocent third parties remain invalid (absent ratification or validation). *See Blades v. Wisehart*, 2010 WL 4638603, at *1, *12 (Del. Ch. Nov. 17, 2010), *superseded by statute on other grounds*, 8 *Del. C.* §§ 204, 205.

Delaware's version of the Uniform Commercial Code provides a defense against invalidity to a bona fide purchaser for value:

> A security other than one issued by a government or governmental subdivision, agency, or instrumentality, even though issued with a defect going to its validity, is valid in the hands of a purchaser for value and without notice of the particular defect unless the defect involves a violation of a constitutional provision. In that case, the security is valid in the hands of a purchaser for value and without notice of the defect, other than one who takes by original issue.

6 *Del. C.* § 8-202(b)(1); *see id.* § 8-205 (providing that "[a]n unauthorized signature placed on a security certificate before or in the course of issue is ineffective" except against a "purchaser for value . . . without notice of the lack of authority").

The statute defines "value" as follows:

> Except as otherwise provided in Articles 3, 4, and 5, a person gives value for rights if the person acquires them:

(1) In return for a binding commitment to extend credit or for the extension of immediately available credit, whether or not drawn upon and whether or not a charge-back is provided for in the event of difficulties in collection;

(2) As security for, or in total or partial satisfaction of, a preexisting claim;

(3) By accepting delivery under a preexisting contract for purchase; or

(4) In return for any consideration sufficient to support a simple contract.

*Id.* § 1-204.

Under these provisions, AnneMarieCo was not a purchaser for value. AnneMarieCo received the shares as a gift. Unless otherwise ratified or validated, the shares remain invalid notwithstanding the transfer to AnneMarieCo. The defendants do not dispute this point. Summary judgment on this issue is granted in favor of the Company.

**B.      Count IV Of The Counterclaims: Whether The Issuances Can Be Validated Pursuant To Section 205 Of The DGCL.**

In Count IV of the Counterclaims, the defendants ask the court to exercise its authority under Section 205 of the DGCL to validate the actions that Farley took between February 10, 2016, and March 9, 2018, including Farley's issuance of twenty-five million shares to himself and his compensation of $150,000 per year. Ctrcl. ¶ 80. The Company seeks summary judgment on this claim, contending that (i) Farley did not take any "corporate acts" and (ii) whatever Farley may have attempted to do cannot be validated because the board lacked sufficient members to muster a quorum at the time the acts were performed. Contrary to the Company's arguments, this court has the power under Section 205 to validate Farley's acts. Whether the court will exercise that power can only be determined after trial.

44

## 1. The Scope Of Sections 204 And 205

Effective April 1, 2014, the Delaware General Assembly enacted Sections 204 and 205 of the DGCL. *See* 8 *Del. C.* §§ 204, 205 (the "Validation Provisions"). The substantive purpose of the Validation Provisions was "to overrule the existing precedents requiring that defective stock and acts be found void." C. Stephen Bigler & John Mark Zeberkiewicz, *Restoring Equity: Delaware's Legislative Cure for Defects in Stock Issuances and Other Corporate Acts*, 69 Bus. Law. 393, 394 (2014) [hereinafter "*Restoring Equity*"]. Procedurally, the Validation Provisions established two statutory methods that parties can use to fix defective corporate acts that otherwise might be void. Section 204 is "a 'self-help' provision that allows the board of directors, by following specified procedures, to validate a defective corporate act." *Id.* at 402. Section 205 is a judicial mechanism under which identified parties can "petition the Delaware Court of Chancery to enter an order validating or invalidating, as the case may be, the defective act." *Id.*

The "keystone" provision is Section 204(a). *Id.* It states that "no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in this section or validated by the Court of Chancery in a proceeding brought under § 205 of this title." 8 *Del. C.* § 204(a). This provision "legislatively overturns" precedents which held "that stock issued or acts taken in contravention of the DGCL are void and not voidable and thus not susceptible to ratification or validation on equitable grounds or otherwise." *Restoring Equity*, *supra*, at 402.

Other subsections in Section 204 establish procedures that a board of directors can use to ratify defective corporate acts. 8 *Del. C.* § 204(b)–(d), (g). No one in this case

45

invokes these provisions. The Company brought this lawsuit to invalidate actions that Farley purported to take, and Farley is no longer in control of the Company and therefore cannot use Section 204.

Section 205 confers standing on certain parties to seek relief from the Court of Chancery if self-help is unavailable or itself subject to challenge. Section 205(a) provides that

> upon application by the corporation, any successor entity to the corporation, any member of the board of directors, any record or beneficial holder of valid stock or putative stock, any record or beneficial holder of valid or putative stock as of the time of a defective corporate act ratified pursuant to § 204 of this title, or any other person claiming to be substantially and adversely affected by a ratification pursuant to § 204 of this title, the Court of Chancery may:
>
> (1) Determine the validity and effectiveness of any defective corporate act ratified pursuant to § 204 of this title;
>
> (2) Determine the validity and effectiveness of the ratification of any defective corporate act pursuant to § 204 of this title;
>
> (3) Determine the validity and effectiveness of any defective corporate act not ratified or not ratified effectively pursuant to § 204 of this title;
>
> (4) Determine the validity of any corporate act or transaction and any stock, rights or option to acquire stock; and
>
> (5) Modify or waive any of the procedures set forth in § 204 of this title to ratify a defective corporate act.

*Id.* § 205(a). Item (3) "gives parties the opportunity to seek a determination regarding the effectiveness of an act that the corporation has not yet ratified or has not ratified effectively under Section 204." *Restoring Equity*, *supra*, at 417. The defendants request for relief falls within the scope of item (3) because the defendants have asked the court to validate the

46

defective corporate acts that Farley purported to take and which have neither been ratified under Section 204 nor by other means.[15]

Section 204(h)(1) defines the term "defective corporate act" as follows:

[(i)] an overissue, an election or appointment of directors that is void or voidable due to a failure of authorization, *or*

[(ii)] any act or transaction purportedly taken by or on behalf of the corporation that is, and at the time such act or transaction was purportedly taken would have been, within the power of a corporation under subchapter II of this chapter (without regard to the failure of authorization identified in § 204(b)(1)(D) of this title), but is void or voidable due to a failure of authorization.

*Id.* § 204(h)(1) (emphasis added and formatting altered). The definition thus describes two categories of defective corporate acts. The first embraces overissues, elections of directors, or an appointment of directors. The second encompasses "any act or transaction purportedly taken by or on behalf of the corporation that is, and at the time such act or transaction was purportedly taken would have been, within the power of a corporation under subchapter II of this chapter." In both cases, the definition requires that the act in question be "void or voidable due to a failure of authorization."

Section 204(h)(2) defines a "failure of authorization" to mean

(i) the failure to authorize or effect an act or transaction in compliance with

---

[15] The current action also falls within the scope of item (4), which gives the court the power to "[d]etermine the validity of any corporate act or transaction and any stock, rights or options to acquire stock." 8 *Del. C.* § 205(a)(4). As discussed below, Farley engaged in corporate acts. Because Farley was the sole remaining director when he purported to take those acts, the resulting shares and compensation is invalid. *See* Part II.A, *supra*. Under item (4), the court has the power validate those acts.

47

(A) the provisions of this title,

(B) the certificate of incorporation or bylaws of the corporation, or

(C) any plan or agreement to which the corporation is a party or the disclosure set forth in any proxy or consent solicitation statement, if and to the extent such failure would render such act or transaction void or voidable; or

(ii) the failure of the board of directors or any officer of the corporation to authorize or approve any act or transaction taken by or on behalf of the corporation that would have required for its due authorization the approval of the board of directors or such officer.

*Id.* § 204(h)(2) (formatting altered). A failure of authorization is thus a failure to comply with the requirements for the exercise of corporate power.

## 2.     A Corporate Act

The Company maintains that validation under Section 205 is unavailable because Farley did not engage in any "corporate acts." According to the Company, a corporate act only exists if the intra-corporate actor that purported to take the corporate act had the authority to act and could have taken it, but erred in properly exercising their authority. Contrary to the Company's position, the requirement of a "corporate act" addresses a different issue: the necessity that there have been a bona fide effort to exercise corporate power, rather than a backward-looking wistfulness for a past event that never took place.

"Embedded within the definition of defective corporate act is the premise that an act, albeit defective, had occurred." *Restoring Equity*, *supra*, at 403. This embedded premise preserves the common law expectation that there must have been an actual attempt to exercise corporate power. *See Liberis v. Europa Cruises Corp.*, 1996 WL 73567, at *8 (Del. Ch. Feb. 8, 1996) ("[T]he complete absence of board action is not an irregularity

48

correctible by routine ratification."), *aff'd*, 702 A.2d 926 (Del. 1997) (TABLE). Consistent with this rule, the Validation Provisions "may not be used to authorize retroactively an act that was never taken but the corporation now wishes had occurred, or to 'backdate' an act that did occur but that the corporation wishes had occurred as of an earlier date." *Restoring Equity*, *supra*, at 403. Parties attempting to invoke the Validation Provisions cannot pretend that an attempt to act took place when it really did not.

Once it is understood that there must have been a historical attempt to take corporate action, the next question is what level of evidence is necessary to demonstrate that the attempt took place. In *In re Numoda Corp. Shareholders Litigation*, this court considered whether to validate a series of contested actions under Section 205 in a dispute involving the principals of a privately held company and various recipients of putative stock. 2015 WL 402265 (Del. Ch. Jan. 30, 2015), *aff'd*, 128 A.3d 991 (Del. 2015) (TABLE). The principals "had a default policy of not issuing stock certificates and used informal processes." *Id.* at *3. "Generally speaking, board meetings did not involve prior notice, minutes, or other features familiar to our corporate law." *Id.* As a result, the evidence of the contested acts "largely exist[ed] in the form of testimony, documents prepared by [an] independent contractor . . . , and representations by agents of the corporation (such as tax filings) not formally adopted by the board." *Id.*

In determining whether there had been a corporate act that could be validated, the *Numoda* court distinguished between "a bona fide effort bearing resemblance to a corporate act but for some defect that made it void or voidable" on one hand, and those acts that "extend far beyond failures of corporate governance features" on the other. *Id.* at *10.

49

While recognizing that Delaware law permits boards to conduct their business with some degree of informality, the court stressed that

> there must be a difference between corporate acts and informal intentions or discussions. Our law would fall into disarray if it recognized, for example, every conversational agreement of two or three directors as a corporate act. Corporate acts are driven by board meetings, at which directors make formal decisions. The Court looks to organizational documents, official minutes, duly adopted resolutions, and a stock ledger, for example, for evidence of corporate acts.

*Id.* at *9.

Applying this standard in a post-trial decision, the court found sufficient evidence to support a corporate act involving the issuance of what it called "the 2004 Exchange Stock," including a formal ratification attempt, entries in the stock ledger and share register, and other evidence. *Id.* at *10. The court also found sufficient evidence of a meeting of the board at which the directors approved and directed the issuance of some 5,725,000 shares of stock. *Id.* at *11. And the court found that a stock certificate and a later attempt at ratification plus testimony and other documents were sufficient to support a corporate act involving the separate issuance of 5,100,000 shares of stock. *Id.* at *12. But the court found insufficient evidence of a corporate act to establish an issuance of 400,000 shares of stock, noting that the record consisted only of "testimony and sundry documents, none of which replaces official stock ledgers or effective resolutions." *Id.*

On the facts of this case, Farley's attempts to cause the Company to issue stock easily satisfy the evidentiary requirements for a corporate act. Farley purported to take action by executing the Board Consent and the Revised Committee Consent. He had two separate law firms (Stein Riso and Griffitts O'Hara) review the consents before they were

50

executed. Both rendered opinions for the benefit of the Company's transfer agent addressing the issuances. Farley also caused the Company to issue a stock certificate for his shares, and he caused the Company to make filings with the SEC that disclosed the issuances. The record clearly reflects bona fide efforts to take corporate action.

The record is more sparse regarding Farley's decision to award himself a salary. The strongest evidence is a Form 8-K which disclosed that "the Company's board of directors . . . directed the Company to accrue $150,000 annually as compensation to Mr. Farley, to be paid when the company has sufficient funds." Ex. 5. Another reference appears in the Company's 2016 Annual Report, which recorded Farley's salary as an accrued expense. Ex. NNN at 19, F-6, F-17. Farley also averred in his declaration that he granted himself a salary. Farley Decl. ¶ 34. But there are no minutes of a purported meeting, nor any document purporting to represent a unanimous consent of the sole remaining director. *Cf.* Ex. 6.

Under the court's approach in *Numoda*, this scant evidence calls into question whether Farley can establish the existence of a corporate act involving his salary that could be validated under Section 205. *Numoda*, however, was a post-trial decision, and this case is currently before the court on a motion for summary judgment. The defendants have presented some evidence which, if credited, could support a finding in their favor. Equally important, as a matter of policy, the Validation Provisions seek to authorize the curing of defects which, if incurable, might destabilize a company's capital structure. *See Restoring Equity*, *supra*, at 402 (citing the "domino effect" that can result from a defective corporate act that infects subsequent acts); *Olsen v. ev3*, 2011 WL 704409, at *11 (Del. Ch. Feb. 21,

51

2011) (same). It is easy to imagine settings in which a corporate act took place years ago, perhaps during the formative days of the corporation, and the issue was not identified or addressed until years later, perhaps when the company is cleaning up its records for an initial public offering or an acquisition. At that point, the documentary evidence of the corporate act might well be incomplete or unavailable, yet a critical flaw in the capital structure would still need to be fixed. Because there are readily conceivable situations in which the equities might convince a court to act based on an abbreviated evidentiary record, it would be dangerous to hold categorically that validation under Section 205 requires more than just witness testimony, or even a combination of testimony and some form of corroborating evidence, such as a securities filing. If that rule were adopted, the Fates would likely conspire promptly to put the proposition to the test in a scenario where its application appeared inequitable. This court will not rule as a matter of law that a corporate act susceptible of validation could not have taken place. It will determine at trial, after evaluating Farley's credibility, whether the evidentiary record is sufficient to support the existence of a corporate act regarding his salary.

The Company's request for summary judgment based on the absence of any corporate acts is denied. The Board Consent and the Revised Committee Consent were clearly attempts at corporate acts. The evidence on Farley's salary is less certain, but could support a finding of a corporate act.

### 3.    A Defective Corporate Act

In its principal argument in favor of summary judgment, the Company maintains that the court cannot validate Farley's acts because they were not "within the power of a

corporation." 8 *Del. C.* § 204(h)(1). According to the Company, because the board lacked a sufficient number of directors to supply a quorum, the Company lacked the "raw corporate power" to take any acts. Dkt. 212 at 5. This argument misunderstands the distinction between the power of the corporation and a failure of authorization.

### a. The Concept Of Corporate Power

Properly understood, the concept of corporate power refers to whether the entity has been granted the ability to engage in a given act. The concept of authorization refers to whether the proper intra-corporate actors or combination of actors, such as the corporation's officers, directors, or stockholders, have taken the steps necessary to cause the corporation to take the given act.[16]

---

[16] The distinction between power and authorization has a lengthy pedigree. Questions about corporate power were an "oft-recurring theme" in the "formative years of corporation law in the 19th and early 20th centuries," when parties frequently invoked the *ultra vires* doctrine to challenge the validity of corporate action. 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 11.01, at 11-10 (2019). The desire to preempt *ultra vires* challenges "led the old school of corporate draftsmen to include page after page of boiler-plate corporate powers in the 'purpose' sections of their certificates of incorporation." *Id.* This practice resulted in "[c]orporate charters of stultifying length and complexity," but without them, drafters feared that a corporate action could be held invalid on the theory that the corporation lacked the power to take it. *Id.* One of the goals of the major revision to the DGCL that took place in 1967 was to eliminate questions about corporate power by

> (i) removing from Section 102(b)(2) any requirements that a certificate of incorporation set out explicitly the specific business or purposes for which a corporation is organized, thereby removing the statutory requirement that charters set forth express or implicit limitations upon what business a corporation might pursue; (ii) eliminating from Section 121 all implications that the corporate powers and authority granted to Delaware corporations are strictly limited to those powers expressly granted by the statute or their

53

The definition of "defective corporate act" adopts this distinction. The definition first frames a defective corporate act in terms of an act that is and was at the time it was purportedly taken "within the power of a corporation under subchapter II of this chapter . . . ." 8 *Del. C.* § 204(h)(1). It then refers to the "failure of authorization" that makes the act void or voidable absent ratification or validation. *Id.*

The reference to "subchapter II of this chapter" points to subchapter II of the DGCL, entitled "Powers." That subchapter contains seven sections. The first three (§§ 121, 122, and 123) identify the powers possessed by every Delaware corporation. The last three (§§ 125, 125, and 127) identify the powers which, with certain narrow exceptions, are denied to Delaware corporations. The intervening section, titled "Effect of lack of corporate capacity or power; ultra vires," limits the effect of the *ultra vires* doctrine by providing generally that "[n]o act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation was without capacity or power to do such act or to make or receive such conveyance or transfer . . . ." *Id.* § 124; *see generally Carsanaro*, 65 A.3d at 648–54 (discussing Section

---

certificates of incorporation; and (iii) abolishing through enactment of Section 124 whatever vestiges of the ultra vires doctrine may have remained with respect to the corporation's dealings with third parties . . . .

*Id.* § 11.01, at 11-1. These steps "have for virtually all intents and purposes obviated inquiries into whether or not Delaware corporations as a matter of their fundamental power or authority can undertake otherwise lawful acts." *Id. See generally Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 648–54 (Del. Ch. 2013) (discussing *ultra vires* doctrine), *abrogated on other grounds by El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016).

124). Illustrating that the reference to subchapter II is an intentional cross-reference to these sections, the *Restoring Equity* article contains a modified definition of "defective corporate act" that replaces the reference to subchapter II with a specific reference to "[sections 121 through 127 of the DGCL, which deal with the general and specific powers granted to Delaware corporations, and the specific limits on those powers]." *Restoring Equity*, *supra*, at 402–03.

Section 121(a) is the principal section of the DGCL addressing corporate power. Titled "General powers," it states:

> In addition to the powers enumerated in § 122 of this title, every corporation, its officers, directors and stockholders shall possess and may exercise all the powers and privileges granted by this chapter or by any other law or by its certificate of incorporation, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business or purposes set forth in its certificate of incorporation.

8 *Del. C.* § 121(a).

Notably, Section 121(a) confers corporate power collectively on "every corporation, its officers, directors and stockholders." By using this terminology, Section 121(a) intentionally avoids any implication as to which intra-corporate actors or combinations of actors could cause the corporation to exercise its powers. The DGCL "elsewhere ascribes to each of these groups specific powers and authority with respect to specific types of transactions. It is to these latter provisions that one must look to determine which group or groups can exercise, singly or jointly, particular powers." 1 Drexler et al., *supra*, § 11.02, at 11-3. To reinforce this distinction, Section 121(b) provides that when exercising the powers conferred by Section 121(a), the corporation "shall be governed by the provisions

55

and be subject to the restrictions and liabilities contained in this chapter." 8 *Del. C.* § 121(b).

The two subsections of Section 121 thus distinguish between the presence of corporate power (Section 121(a)) and the steps intra-corporate actors must follow to authorize the corporation to exercise its powers (Section 121(b)). Section 121 does not itself specify the requirements that intra-corporate actors must follow to authorize the corporation to exercise its powers.

> Which of the groups is to exercise specific powers, and the manner in which the group is to exercise such powers, is either set forth in the various sections of the General Corporation Law (relating to such matters as amendments to the certificate of incorporation, mergers, sales of assets, etc.), the certificate of incorporation or by-laws, or is allocated according to traditional common law concepts of exercise of corporate power.

1 Balotti & Finkelstein, *supra*, § 2.1 (footnotes omitted); *accord* 1 Drexler et al., *supra,* § 11.02, at 11-3.

In addition to the general grant of power in Section 121(a), Section 122 enumerates seventeen specific powers a Delaware corporation can exercise.[17] The existence of these

---

[17] *See* 8 *Del. C.* § 122. The powers enumerated in Section 122 are "a curious mixture." 1 Drexler et al., *supra*, § 11.03[1], at 11-4.

> Some of them deal exclusively with the organic structure of the corporation itself. A second group addresses the internal functioning of the corporation, while a third group deals with the power to conduct various aspects of corporate business. The inclusion of a specific power on the list appears to have been a matter of historical accident, with additions having been made from time to time by amendment to address a perceived problem, without

specific powers helps illustrate the distinction between the existence of corporate power and the ability of intra-corporate actors to authorize the corporation to exercise that power.

For example, Section 122(6) grants a Delaware corporation the power to "[a]dopt, amend and repeal bylaws." 8 *Del. C.* § 122(6). Another section of the DGCL—Section 109—governs how particular intra-corporate actors can authorize the corporation to exercise this power. *See id.* § 109. Section 109(a) states that for a corporation with capital stock, the following intra-corporate actors can authorize the exercise of that corporate power: (i) the incorporators until a board of directors is designated, (ii) the board of directors until the corporation has received any payment for any of its stock, (iii) the stockholders after the corporation has received any payment for any of its stock, and (iv) the board of directors concurrently with the stockholders if the certificate of incorporation so provides, except where otherwise limited by the DGCL. *Id.* § 109(a); *see* 1 Drexler et al., *supra,* § 9.02. Section 109(b) places an additional limitation on the ability of these intra-corporate actors to authorize the exercise of that corporate power by providing that

> any overall concept or plan as to which corporate powers or types of powers ought to be specifically enumerated.

*Id.* One additional power—the power to deal in securities—is addressed specifically in Section 123. *See* 8 *Del. C.* § 123. A plausible argument can be made that Section 121 in its current form eliminates the need for Sections 122 and 123. *See* 1 Drexler et al., *supra,* § 11.03[1], at 11-3 to 11-4; *see also id.* § 11.04, at 11-9. As someone who has had the opportunity to read many late nineteenth and early twentieth century *ultra vires* cases, I have the sense that the General Assembly largely granted the specific powers enumerated in Sections 122 and 123 in response to specific court decisions, often in other jurisdictions, which held that a corporation lacked the power in question.

"[t]he bylaws may contain any provision, not inconsistent with law or with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees." 8 *Del. C.* § 109(b); *see also* 1 Drexler et al., *supra,* § 9.04. Sections 109(a) and (b) thus limit the extent to which intra-corporate actors can authorize the exercise of the corporate power to adopt, amend, or repeal bylaws. Under Section 122(6), however, the corporate power to adopt, amend, or repeal bylaws always exists. 8 *Del. C.* § 122(6).

Questions about whether the relevant intra-corporate actors have complied with the requirements of Section 109 when adopting, amending, or repealing bylaws raise issues of authorization, not power. The same is true for questions about whether the relevant intra-corporate actors have complied with the corporation's charter or bylaws. If, for example, the charter provides that directors can adopt, amend, alter, or repeal bylaws only by the unanimous vote of a quorum consisting of all members of the board then in office, the fact that a majority of directors then in office purported to adopt a bylaw at a meeting attended only by those directors renders the bylaw invalid, but that is due to a failure of authorization, not a lack of corporate power. *Cf. Frantz Mfg. Co. v. EAC Indus.,* 501 A.2d 401, 407 (Del.1985) (determining the validity of a bylaw requiring a unanimous director vote and the validity of non-compliant action). The power to amend the bylaws invariably exists.

Today, the DGCL retains only three limitations on corporate power. *See* 1 Balotti & Finkelstein, *supra*, §§ 2.4–2.6. First, with specified exceptions, no corporation formed under the DGCL after April 18, 1945, may confer academic or honorary degrees. 8 *Del. C.*

§ 125. Second, no corporation formed under the DGCL can exercise banking power. *Id.* § 126(a). Third, a Delaware corporation that is designated as a private foundation under the Internal Revenue Code cannot fail to comply with certain tax provisions, unless its charter provides that the restriction is inapplicable. *Id.* § 127. That said, a corporation retains the ability to introduce uncertainty about its capacity or power by including provisions in its charter that disavow particular powers or forbid the corporation from entering into particular lines of business or engaging in particular acts. *See* 1 Balotti & Finkelstein, *supra*, § 2.1.

### b. Corporate Power In This Case

The plain language of the definition of "defective corporate act" thus uses the concept of "corporate power" in the sense of the powers granted under subchapter II of the DGCL, and it distinguishes the concept of corporate power from a "failure of authorization." The latter definition deploys the concept of authorization to refer to whether the relevant intra-corporate actors have properly authorized the corporation to exercise its power in compliance with the DGCL and the entity's constitutive documents. As the definition makes clear, a failure of authorization may arise because the intra-corporate actors have failed to comply with (i) "the provisions of this title," *i.e.*, Title 8 of the Delaware Code, which includes the DGCL, (ii) "the certificate of incorporation or bylaws of the corporation," or (iii) "any plan or agreement to which the corporation is a party . . . ." 8 *Del. C.* § 204(h)(2). A failure of authorization can also encompass a simple failure of the board or of an officer to authorize or approve an act that otherwise requires the approval of that intra-corporate actor. *Id.*

59

In this case, the Company claims it lacked the "raw corporate power" to engage in any of the acts that Farley purported to take because there were insufficient directors in office to constitute a quorum. *See* Dkt. 212 at 5. That is incorrect. The absence of a quorum is not a question of corporate power. It is a failure to comply with "a provision of this title" (§ 141(b) of the DGCL) and the Company's charter and bylaws. It is therefore a failure of authorization within the meaning of Section 204(h)(2).

For purposes of Farley's attempt to issue stock, the question of corporate power is answered by Section 121 of the DGCL, under which "every corporation, its officers, directors and stockholders shall possess and may exercise all the powers and privileges granted by this chapter or by any other law or by its certificate of incorporation . . . ." 8 *Del. C.* § 121. The reference to "this chapter" is a reference to the DGCL. One of the powers "granted by this chapter" is the power to issue shares. Section 151(a) states:

> Every corporation may issue 1 or more classes of stock or 1 or more series of stock within any class thereof, any or all of which classes may be of stock with par value or stock without par value and which classes or series may have such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in the certificate of incorporation or of any amendment thereto, or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors pursuant to authority expressly vested in it by the provisions of its certificate of incorporation . . . .

*Id.* § 151(a). The Company had the raw corporate power to issue shares.

For purposes of Farley's attempt to grant himself a salary as an officer, the question of corporate power is answered generally by Section 121 of the DGCL and specifically by Section 122(5), which grants every corporation the power to "[a]ppoint such officers and

60

agents as the business of the corporation requires and to pay or otherwise provide for them suitable compensation." *Id.* § 122(5). The Company had the raw corporate power to pay Farley as an officer.

To the extent Farley contends that he also granted himself compensation as a director, the question of corporate power is answered by Section 121 and Section 141(h), which states that "[u]nless otherwise restricted by the certificate of incorporation or bylaws, the board of directors shall have the authority to fix the compensation of directors." *Id.* § 141(h). The Company had the raw corporate power to pay Farley as a director.

This court has the authority to validate Farley's issuance of shares and his approval of his compensation because those acts are within the power of the corporation but are void or voidable due to a failure of authorization. The acts fall squarely within the grant of authority provided by Section 205(a)(3).

### c. The *View* Decisions

To argue against this settled understanding of corporate power, the Company relies on this court's decisions in *Nguyen v. View, Inc.* (*View I*), 2017 WL 2439074 (Del. Ch. June 6, 2017), *reargument denied*, *Nguyen v. View, Inc.* (*View II*), 2017 WL 3169051 (Del. Ch. July 26, 2017). Properly read, the *View* decisions are consistent with the distinction between the existence of corporate power and a failure of authorization that the Validation Provisions establish. Moreover, to eliminate any potential implication that the *View* decisions support a different interpretation, the General Assembly amended the statute.

The *View* decisions concerned the validity of what the decision called the "Series B Financing"—a recapitalization that dramatically reduced the voting power of Paul Nguyen,

61

the ousted founder of View, Inc., and the holder of 70% of its common stock. *View I*, 2017 WL 2439074, at \*2–4. As part of a settlement between View and Nguyen, View asked Nguyen to consent to the Series B Financing. *Id.* at \*4. The transaction documents included provisions that would have adversely affected Nguyen, including a provision that would have eliminated his ability as the holder of a majority of the common stock to protect himself against increases in the number of authorized shares. *Id.* The settlement gave Nguyen the right to rescind his consent within seven days. *Id.*

Nguyen initially executed the consent, but subsequently exercised his right to rescind it. *Id.* In the interim, View completed the Series B Financing. *Id.* at \*5. Nguyen commenced an arbitration to invalidate the Series B Financing, and the arbitrator eventually ruled in his favor. *Id.* By the time the arbitrator issued his ruling, View had completed four additional financings that raised over $500 million. *Id.* The arbitral award called into question the validity of the original Series B Financing and each subsequent financing, putting at risk the company's entire capital structure. *Id.*

In an effort to fix these problems, two venture capital firms who controlled View converted shares of Series A preferred stock into enough shares of common stock to constitute a majority of that class. The venture capital firms and their board representatives then proceeded to attempt to ratify the Series B Financing and subsequent transactions under Section 204. *Id.* Nguyen filed suit under Section 205, contending that the transactions could not be ratified because he had withheld his consent. *Id.* at \*6. View moved to dismiss Nguyen's complaint. *Id.*

62

The central legal question on the motion to dismiss was "whether an act that the majority of stockholders entitled to vote deliberately declined to authorize, but that the corporation nevertheless determined to pursue, may be deemed a 'defective corporate act' under Section 204 that is subject to later validation by ratification of the stockholders." *Id.* Citing the definition of "defective corporate act," the court agreed that View had the corporate power under Sections 121 and 151 of the DGCL to issue the Series B stock as part of the Series B Financing. *Id.* at *8. But the court did not regard that as the end of the matter. Noting that "the defective corporate acts that a corporation purports to ratify must be within the corporation's power '*at the time such act was purportedly taken*,'" *id.* at *9 (quoting 8 *Del. C.* § 204(h)(1)), the court observed that when View engaged in the Series B Financing, "Nguyen enjoyed class voting protections as the holder of the majority of the common stock" and "had deliberately withheld his consent for the transaction—consent that was required for the transaction to be valid as a matter of law." *Id.* The court concluded that "at the time the defective corporate acts at issue here were taken, the Company did not have the power to take these acts because its majority common stockholder had declined to approve them." *Id.*

Despite having treated the issue in terms of "the power to take these acts," the court explained that what was really at stake was the distinction between a defective corporate act and an act that a relevant intra-corporate actor had properly rejected:

> What occurred when Nguyen revoked his consent to the Series B Financing was much more than a mere 'failure of authorization' as contemplated by Section 204. It was the classic exercise of the stockholder franchise to say 'no' to a Board-endorsed proposal. . . . The plain meaning of "failure" in [Section 204] is distinct from a "no" vote or outright rejection of the proposal

63

by the majority of stockholders entitled to vote. The reason the Series B Financing was declared void was not that View failed to comply with the [DGCL] or its own governance documents in securing the stockholders' approval of the transaction; the transaction was void because the majority common stockholder deliberately rejected it.

*Id.* To further emphasize this point, the court stated:

Lest there be any lingering doubt regarding the distinction between a "failure" to authorize and a "rejection" of a corporate proposal, the plain meanings of these terms brings the matter into inescapable focus. "Failure" has been defined as "omission of occurrence or performance"; "a lack of success"; "deficiency; lack; want"; "[a]n omission of an expected action, occurrence, or performance." In contrast, to "reject" means "to refuse to accept, consider, submit to, take for some purpose, or use."

*Id.* (citations and footnotes omitted). The court therefore denied the motion to dismiss, holding that Nguyen had "pled facts that support his prayers for declaratory judgments that the 2016 Ratifications cannot be sanctioned under any reading of Section 204." *Id.* at *11.

View moved for reargument, and the court denied the motion, reaching the same conclusion. The court initially framed the analysis in terms of corporate power, stating that "[w]hen Nguyen withdrew his consent . . . and the arbitrator then determined that the properly withdrawn consent rendered the Series B Financing void, the ruling confirmed that View did not have the 'power' to undertake the Series B Financing at the time it closed." *View II*, 2017 WL 3169051, at *3. But the court immediately returned to the distinction between a defective authorization and a legitimate rejection, reiterating that what had taken place was a rejection, not a failure of authorization. *Id.* at *3 & n.26.

The core holdings of the *View* decisions were thus that a corporation cannot claim that an act was defectively authorized when in fact it was rejected by an intra-corporate actor whose consent was needed for approval. The *View* decisions nevertheless contained

language which could be read to suggest that a corporate act was not subject to validation even if the corporation had the power under subchapter II to take the action in question, simply because the proper intra-corporate actors had not approved it. To eliminate the latter implication, the General Assembly responded by amending the definition of "defective corporate act" to add the clause "(without regard to the failure of authorization identified in § 204(b)(1)(D) of this title)" after the requirement that the act must be "within the power of a corporation." *See* S.B. 180, 149th Gen. Assem. § 7 (2018) (the "2018 Amendment"). The full definition now reads

> an overissue, an election or appointment of directors that is void or voidable due to a failure of authorization, or any act or transaction purportedly taken by or on behalf of the corporation that is, and at the time such act or transaction was purportedly taken would have been, within the power of a corporation under subchapter II of this chapter (without regard to the failure of authorization identified in § 204(b)(1)(D) of this title), but is void or voidable due to a failure of authorization.

8 *Del. C.* § 204(h)(1). The "failure of authorization identified in § 204(b)(1)(D)" is "the nature of the failure of authorization in respect of each defective corporate act to be ratified." *Id.* § 204(b)(1)(D). For *View*, the failure of authorization would have been the failure to obtain approval from the holders of a majority of the common stock, had the absence of approval resulted from a failure of authorization, rather than an explicit rejection.

Through the 2018 Amendment, the General Assembly confirmed that the nature of the failure of authorization does not determine whether or not the defective corporate act is within the corporation's power and hence capable of validation. Whether the corporation has the corporate power to take the action in question is determined by the scope of

65

subchapter II of the DGCL. The synopsis accompanying the 2018 Amendment emphasized this point:

> The amendments to Section 204(h)(1) are intended to eliminate any implication from [the *View* decisions] suggesting that an act or transaction may not be within the power of a corporation—and therefore may not constitute a "defective corporate act" susceptible to cure by ratification—solely on the basis that it was not approved in accordance with the provisions of the Delaware General Corporation Law or the corporation's certificate of incorporation or bylaws. The amendments would not, however, disturb the power of the Court of Chancery to decline to validate a defective corporate act that had been ratified under Section 204, or to declare invalid any defective corporate act, on the basis that the failure of authorization that rendered such act void or voidable involved a deliberate withholding of any consent or approval required under the Delaware General Corporation Law, the certificate of incorporation or bylaws, nor would it limit, eliminate, modify or qualify any other power expressly granted to the Court of Chancery under Section 205 of the Delaware General Corporation Law.

S.B. 180 syn., 149th Gen. Assem. (2018). Two commentators have addressed the same issue, explaining that the 2018 Amendment

> overturn any implication from [the *View* decisions] that an act or transaction may not be within the power of a corporation solely on the basis that it was not approved in accordance with the provisions of the DGCL or the corporation's certificate of incorporation or bylaws. Indeed, defective corporate acts require ratification because originally they were not so approved. The amendments attempt to clarify that the failure to approve an act in accordance with the DGCL or the certificate of incorporation or bylaws may not, of itself, serve as a basis for excluding the act from the scope of the statute.

John Mark Zeberkiewicz & Stephanie Norman, *2018 Proposed Amendments to the General Corporation Law of the State of Delaware*, INSIGHTS: Corp. & Secs. L. Advisor, Apr. 2018, at 14, 24–25.

Relying on the *View* decisions, the Company makes two arguments. First, the Company contends that the absence of sufficient directors to constitute a quorum meant

66

that, as in *View*, the Company lacked the ability "at the time" to take corporate action. In context, the definition states that a defective corporate act is

> any act or transaction purportedly taken by or on behalf of the corporation that is, *and at the time* such act or transaction was purportedly taken would have been, *within the power* of a corporation under subchapter II of this chapter (without regard to the failure of authorization identified in § 204(b)(1)(D) of this title), but is void or voidable due to a failure of authorization.

8 *Del. C.* § 204(h)(1) (emphasis added). Read in context, the reference to "at the time" simply means a power that the DGCL granted a corporation "at the time" of the purported corporate act. The phrase ensures that the analysis considers whether the corporation had the power to act both historically, when the act was taken, and at the time of ratification or validation.[18]

It is true that the *View* decisions relied on the phrase "at the time" to create conceptual space for the requirement that Nguyen have consented to the Series B Financing, but the thrust of those decisions was the distinction between a defective

---

[18] Other sections of the DGCL use the phrase "at the time" similarly. *See, e.g.*, H.B. 341, 150th Gen. Assem. § 2 (2020) (amending 8 *Del. C.* § 102(b)(7) by adding the language: "An amendment, repeal or elimination of such a provision shall not affect its application with respect to an act or omission by a director occurring before such amendment, repeal or elimination unless the provision provides otherwise *at the time* of such act or omission" (emphasis added)); 8 *Del. C.* § 145(f) (prohibiting elimination of right to indemnification or advancement "after the occurrence of the act or omission that is the subject of . . . [a] proceeding for which indemnification or advancement       of expenses is sought, unless the provision in effect *at the time* of such act or omission explicitly authorizes such elimination or impairment after such action or omission has occurred" (emphasis added)); *id.* § 145(d) (providing mechanisms for determining whether to indemnify "a director or officer of the corporation at the time of such determination").

corporate act and a rejection. The 2018 Amendment made clear that the phrase "at the time" was not intended to introduce concepts of authorization into the question of corporate power. Rather, corporate power is to be analyzed "without regard to the failure of authorization" that otherwise renders the act void or voidable. What survives this amendment is the well-reasoned distinction in *View* between a failure of authorization and an affirmative rejection.

In this case, Farley's acts are voidable because of a failure of authorization. Under Sections 121, 122, 141, and 151, the Company had the raw corporate power under subchapter II to take those acts. The absence of sufficient directors to constitute a quorum resulted in a failure of authorization, not a lack of corporate power. The *View* decisions do not help the Company in this respect.

Pivoting nimbly, the Company next argues that this case is analogous to *View* because there was a real-world rejection of Farley's proposal to issue shares. The Company points out that before Levy resigned, he opposed Farley's plan to issue the two of them shares. The Company contends that this was a rejection comparable to Nguyen's withdrawal of his consent in *View*.

If Farley relied on action taken while Levy was still a director, then the Company's reasoning would be sound. As long as Levy was a director, his refusal to accede to the issuance of shares was a rejection within the meaning of the *View* decisions, and any effort by Farley to document the issuance of shares and seek validation would be improper. Once Levy resigned, however, he left Farley as the sole remaining director. From that point on, Farley was the only individual clothed with the trappings of corporate authority who could

purport to cause the Company to act. After resigning, Levy no longer had the ability to deprive Farley of authority. When Farley purported to act as the sole remaining director, the only obstacle to the effectiveness of his actions was the quorum requirement under Section 141(b) and the Company's charter and bylaws. The definition of "failure of authorization" makes clear that Farley's inability to satisfy those requirements was just that—a failure of authorization that can be validated under Section 205, not an absence of corporate power that cannot.

### d. The Floodgates Argument

In its final argument, the Company contends that if validation is available to Farley, then it will be available "to anyone *claiming* to have the power to act on a corporation's behalf, even if the person lacks such power," and "chaos will result." Dkt. 212 at 6. According to the Company,

> Anyone could purportedly act on a corporation's behalf and ask the Court to validate an act under Section 205. Such a usurper would be entitled to a full trial, including discovery, on whether Section 205(d)'s equitable factors tilt in his or her favor, even though the person had no power to act on the corporation's behalf, and even when the individuals actually vested with the power to control the corporation disagree with the action. The door would be opened to resentful directors, disgruntled CEOs, conniving employees, and minority shareholders who could lay claim to a "corporate" act in order to drag any corporation into court for an equitable analysis.

*Id.* at 6–7.

Nothing about the current case opens the door to that dystopian scenario. For starters, the General Assembly established the universe of claimants entitled to seek relief under Section 205. Those parties are

the corporation, any successor entity to the corporation, any member of the board of directors, any record or beneficial holder of valid stock or putative stock, any record or beneficial holder of valid or putative stock as of the time of a defective corporate act ratified pursuant to § 204 of this title, or any other person claiming to be substantially and adversely affected by a ratification pursuant to § 204 of this title.

8 *Del. C.* § 205(a). Parties outside this circle do not have standing to invoke the statute.

Second, as explained above, a Section 205 claimant must identify a bona fide attempt to exercise power sufficient to qualify as a corporate act. A random usurper claiming to have acted on behalf of the corporation will not be able to meet this standard.

Third, granting standing to Farley to seek to validate his defective corporate acts does not stray beyond the confines of Section 205 as framed by the General Assembly. Section 205 grants standing to "any member of the board of directors" or "any record or beneficial holder of valid or putative stock." Farley was the sole remaining director who attempted to take the defective corporate acts, and he is a holder of putative stock. For the reasons discussed previously, he is able to point to evidence of corporate acts that could be validated.

This case is the classic scenario where a disputed corporate act is potentially subject to validation. Chaos will not result from Farley invoking Section 205.

### e.      The Conclusion Regarding Validation

Validation under Section 205 is potentially. Once its legal positions are rejected, the Company does not argue that the facts of the case are so extreme that the court could not potentially validate Farley's acts. And appropriately so, because there is evidence which,

if accepted and construed in the defendants' favor, could support validation. The Company's motion for summary judgment on Count IV of the Counterclaims is denied.

## C.     The Remaining Counterclaims

The Company also seeks summary judgment on Counts I, II, and III of the Counterclaims. In Count I, Farley seeks to recover past due compensation at a rate of $150,000 per annum. In Counts II and III, Farley advances claims for unjust enrichment.

### 1.     Count I Of The Counterclaims: Breach Of Contract

Count I of the Counterclaims asserts that the Company and Farley "agreed . . . that Farley would receive an annual salary of $150,000 'to be paid when the company has sufficient funds.'" Ctrcl. ¶ 47. The Company seeks summary judgment on this count on the theory that as the sole remaining director, Farley could not have validly caused the Company to agree to pay him $150,000.

The Company is right that Farley did not validly act to approve his compensation, but that does not entitle the Company to summary judgment. Farley may be able to convince the court to validate this defective corporate act, at which point that legal defense will no longer be available.

Validating the contract itself will not lead automatically to its enforcement, because validation "only removes the taint of voidness or voidability that stems from the 'failure of authorization.'" *Restoring Equity*, *supra*, at 414. Defective corporate acts, even if ratified or validated, "are subject to traditional fiduciary and equitable review." H.B. 127 syn., 147th Gen. Assem. (2013) ("Ratification of a defective corporate act under § 204 is designed to remedy the technical validity of the act or transaction; it is not intended to

modify the fiduciary duties applicable to either the approval or effectuation of a defective corporate act or transaction or any ratification of such act or transaction."). Nevertheless, assuming Farley prevails on his claim to validate his authorization of his salary and proves that the self-interested compensation was entirely fair, then he can pursue his claim for non-payment. The Company's motion for summary judgment on this count is denied.

### 2. Counts II And III Of The Counterclaims: Unjust Enrichment

Count II of the Counterclaims assert that the Company was unjustly enriched because Farley achieved "significant improvements [in the Company's] business at his own considerable expense," including "Farley's significant financial and/or other contributions." Ctrcl. ¶ 53. Count III asserts that Farley served as an officer and director with the expectation of compensation and provided benefits to the Company, such that the Company will be unjustly enriched if Farley does not receive compensation. *Id.* ¶ 59. At oral argument, Farley's counsel acknowledged that the two counts were substantively indistinguishable. This decision treats Count II as abandoned and only considers Count III.[19]

The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification,

---

[19] If Farley's counsel had not made this concession, then this decision would have granted summary judgment on Count II. In that count, Farley seems to suggest that if his actions as a fiduciary benefitted the corporation, then he should get a cut of the corporation's increased value. To the extent Farley seeks the fair value of his services, that claim is covered by Count III. To the extent Farley maintains that he is equitably entitled to a piece of the upside, he has not articulated a cognizable theory of recovery.

72

and (5) the absence of a remedy provided by law. *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). The Company raises a series of arguments in support of its motion for summary judgment.

First, the Company argues that Farley agreed to serve as a director without pay. *See* Ex. 8 at 1. Farley testified that he agreed to serve without pay because the Company lacked the money, but that he expected to be paid if and when the Company received funds. The conflicting evidence creates a dispute of material fact. Summary judgment on this theory is denied.

Second, the Company argues that under Delaware law, directors are presumed to work without pay absent evidence to the contrary. *See Cahall v. Lofland*, 114 A. 224, 231 (Del. Ch. 1921), *aff'd*, 118 A. 1 (Del. 1922). There is evidence in this case to the contrary. Until the Company suffered reversals, the directors received fees. They agreed to stop taking fees because of the Company's financial situation. Farley testified that he expected to be paid if and when the Company received funds. The conflicting evidence creates a dispute of material fact. Summary judgment on this theory is denied.

Third, the Company argues that Farley may not maintain a claim for unjust enrichment regarding his compensation as an officer or director because the relationship is governed by contract. The Company notes that a corporation's bylaws are interpreted as a contract among the corporation and its officers, directors, and stockholders. The Company then argues that under the bylaws, officer pay is to be determined by the board. *See* Ex. 1 art. VIII § 2 ("The salaries of all officers of the Corporation shall be fixed by the Board of Directors, or in such manner as the Board may prescribe."). The Company further notes

73

that the resolution appointing Farley to the positions of principal executive officer and principal financial officer did not provide for compensation. Ex. 9 at 1. The Company concludes that under Farley's contract with the Company, *i.e.*, the bylaws, Farley is not entitled to any pay.

This is a clever argument that deploys authority from different contexts to create a logical syllogism. The reality is that the Company's bylaws are not the exclusive means by which a director or officer can receive compensation. Moreover, in the absence of a valid contract, principles of *quantum meruit* come into play and can support a recovery under a theory of unjust enrichment. *See Boulden v. Albiorix, Inc.*, 2013 WL 396254, at *14 (Del. Ch. Jan. 31, 2013, revised Feb. 7, 2013); *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006, revised Oct. 16, 2006); *Heimer, Aber & Goldlust v. Ingram*, 1999 WL 1240904, at *2–3 (Del. Super. Aug. 18, 1999), *aff'd*, 748 A.2d 913 (Del. 2000) (TABLE). Viewing the evidence in the light most favorable to Farley, a claim for unjust enrichment could exist. Summary judgment on this theory is denied.

## III. CONCLUSION

The Company's motion for partial summary judgment is granted in part. Farley could not validly take action as the sole remaining director between February 10, 2016, and March 9, 2018. The stock that he issued to himself is invalid, as is the compensation that he attempted to grant to himself. The shares that he gifted to AnneMarieCo remain invalid, notwithstanding their transfer to AnneMarieCo. Summary judgment is granted in the Company's favor on these issues. The Company's motion for partial summary judgment is otherwise denied.